James G. BENDER, Jr., Individually and as Successor Administrator of the Estate of James G. Bender, Sr., Plaintiff-Appellant,

v.

CITY OF ROCHESTER, NEW YORK, Defendant-Appellee.

No. 494, Docket 84–7722.

United States Court of Appeals, Second Circuit.

Argued Jan. 7, 1985.

Decided June 10, 1985.

Scott C. Smith, Rochester, N.Y. (Johnson, Mullan, Brundage & Keigher, P.C., Rochester, N.Y., on brief), for plaintiff-appellant.

Susan L. Hauser, City of Rochester Law Dept., Rochester, N.Y. (Louis N. Kash, Corp. Counsel, Rochester, N.Y., on brief), for defendant-appellee.

Before NEWMAN, PRATT and PECK,* Circuit Judges.

JON O. NEWMAN, Circuit Judge.

■ The question presented on this appeal concerns the constitutionality of procedures followed by the City of Rochester, New York, (the "City") to notify owners of real property that the City has instituted tax foreclosure proceedings against their property. Specifically, we must decide whether the City satisfied the requirements of due process by mailing notice of a tax foreclosure proceeding addressed to the person listed on the land records as the owner of real property, but who in fact was deceased, or whether the City was required to identify and give notice to the distributees of the decedent's estate. For reasons that follow, we hold that the procedures used by the City in this case were constitutionally sufficient.

James G. Bender, Jr. ("Bender" or "James") brought this suit in the District Court for the Western District of New York (Michael A. Telesca, Judge) challenging the City's foreclosure of its tax lien on a parcel of real property located in the City and its subsequent sale of the property to a third party. Bender brought the action on his own behalf as a tenant in common of the property and as administrator of the estate of his father, representing the other co-tenants. The complaint included a cause

* The Honorable John W. Peck of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

of action to quiet title to the property, alleging that the foreclosure sale was void on the ground that the City had deprived the co-tenants of due process of law by selling their property without prior notice. On cross-motions for summary judgment, the District Court ruled that the City's notice procedures satisfied due process and dismissed the complaint. 588 F.Supp. 1405. This appeal followed.

## BACKGROUND

The City's Charter authorizes it "summarily" to foreclose tax liens that are "at least one ... year old." Rochester City Charter § 9–121. Foreclosure proceedings begin when the City's Corporation Counsel files a "foreclosure list" in the Monroe County Clerk's Office identifying the parcels of real property that the Corporation Counsel intends to foreclose.[1] Id. § 9–123. The Corporation Counsel then selects a redemption deadline date. Id. § 9–125(B). Up to that date, any person may redeem property on the foreclosure list by paying delinquent taxes and other fees. Id. § 9–129(A). Moreover, a person with an interest in a parcel on the foreclosure list may serve on the Corporation Counsel a notice of interest or an answer alleging a legal defense to the foreclosure.[2] Id. § 9–131(A), (B). If a person with an interest in property to be foreclosed fails to redeem or to serve a notice of interest or answer by

the redemption deadline date, his interest in the property or defense to the foreclosure is extinguished. Id. § 9–133.

To provide persons an opportunity to protect their interests in property on the foreclosure list, the Corporation Counsel is required to give notice of foreclosure. Notice to the public is provided through publication of a "notice of foreclosure" for six successive weeks in two City newspapers.[3] Id. § 9–125(A), (C). The Corporation Counsel also is obligated to mail a copy of the notice "to the last known address of the owner of each parcel of property on the foreclosure list, as it appears upon the records in the office of the City Treasurer." Id. § 9–127(A).

The City Treasurer's records of property ownership are maintained by the City Assessor. The information contained in these records, which includes the names and mailing addresses of the owners of parcels of real property, is largely derived from deeds recorded in the Monroe County Clerk's Office. When a deed is recorded, the City Assessor obtains a copy and enters the grantee's name on the City Treasurer's records as the new owner of the property. If the deed contains a mailing address for the grantee, the City Assessor records it as well. Otherwise, the Assessor assumes that the mailing address is the same as the property address.[4] While the City has

1. As to each parcel to be foreclosed, the foreclosure list sets forth the tax account number, the street address, the name of the last known owner as the name appears on the City's assessment rolls, and the amount of the tax lien. Rochester City Charter § 9–123(A).

2. When a party timely serves a notice of interest and the City admits or a court finds that the interest is valid, the property is sold with the proceeds applied first to the tax lien plus interest and other charges, and any surplus is handed over to the interested party. Rochester City Charter §§ 9–135(D), (E), 9–139(C), 9–143(B). If the Corporation Counsel determines that an answer alleges a meritorious defense to foreclosure, he is required to remove from the foreclosure list the parcel to which the defense relates. Id. § 9–135(A). Where the Corporation Counsel decides to contest a defense, a hearing is held at which the interested party has the burden of establishing his defense. Id. § 9–

135(B), (C). If the court determines that the defense is valid, it is required to dismiss the foreclosure action with respect to that parcel. Id. § 9–139(B).

3. The published notice states that, on a certain date, the Corporation Counsel commenced foreclosure against parcels on which the City holds tax liens at least one year old. The notice informs interested parties that procedures are available by which they may preserve their interests and that, if they do not timely take those steps, they will be barred from asserting their rights in the foreclosure proceeding. At the time of first publication, a copy of the foreclosure list is published along with the foreclosure notice. Rochester City Charter § 9–125(A), (C).

4. The City Assessor relies on property owners to inform him if they change their mailing addresses or if his records incorrectly list their

adopted these procedures to learn of changes in ownership accomplished through *inter vivos* transfer, it takes no steps to obtain information concerning changes in ownership effected through devise or descent. When a property owner dies, the City Assessor learns of the death and the identity of the new owner and changes the City Treasurer's records accordingly only if notified by the decedent's personal representative.[5]

The following circumstances gave rise to this controversy. James G. Bender, Sr. ("Bender Sr.") owned a parcel of real property located at 27 Pembroke Street in Rochester. The City Treasurer's records listed Bender Sr. as the owner of the property and 27 Pembroke Street as the mailing address for tax bills. Bender Sr. died intestate on December 5, 1979, leaving as his heirs his three children, Robert, James, and Mary Margaret.

Thereafter, Robert Bender filed with the Monroe County Surrogate's Court Clerk's Office a petition for Letters of Administration for his father's estate. Robert's petition, which was indexed in the Monroe County Clerk's Office, listed the names and addresses of his father's distributees and described his father's real property as 27 Pembroke Street. Robert obtained Letters of Administration on February 19, 1980. Since Robert did not notify the City Assessor's office of his father's death, the City Treasurer continued to mail tax bills to Bender Sr. at 27 Pembroke Street. Robert, who resided at 27 Pembroke Street, paid one tax bill that had been issued before his father's death. Robert died on November 19, 1981.

Following Robert's death, James Bender, Jr. applied for, and on October 18, 1982, obtained, successor Letters of Administration for his father's estate. Bender's petition, which was filed and indexed in the same manner as Robert's, also identified Bender Sr.'s distributees and described his real property. Bender failed to inform the City Assessor of the death of Bender Sr. Therefore, the City Treasurer continued to send tax notices to 27 Pembroke Street addressed to Bender Sr. However, after Robert's death, the house at 27 Pembroke Street was left unoccupied, and Bender apparently made no arrangements to pick up mail delivered to that address or to have it forwarded to him.

On November 3, 1982, the City instituted tax foreclosure proceedings against a large number of parcels including the 27 Pembroke Street property. The tax lien on the Pembroke Street parcel was in the amount of $1,301.20, representing unpaid taxes for 1980–1981 and 1981–1982. Publication of the foreclosure list began on November 3, 1982, and the City mailed a notice of foreclosure, addressed to Bender Sr., to 27 Pembroke Street. The notice was not received by any of the tenants in common. An affidavit submitted by the City Treasurer states that the Post Office did not return the notice as "undeliverable." In addition to mailing the notice, the City Treasurer attempted to contact the owner of the Pembroke Street property by sending an official to visit the property on two occasions. That effort, along with an attempt to locate the owner's telephone listing, was unsuccessful. After the redemption deadline date passed with no one coming forward to redeem or file a notice of interest or answer,[6] judgment of foreclosure was en-

---

addresses. A section of the Rochester City Charter obliges property owners to file with the City Treasurer a statement describing their property and showing their name and address and to notify the City Treasurer of changes in their residence. Rochester City Charter § 6–118.

**5.** When the representative of a deceased owner of real property notifies the City Assessor that the owner has died, the Assessor changes the name of the property owner listed on the Trea-

surer's records from "Owner" to "Estate of Owner" and also changes the mailing address if the representative so requests. The Assessor does not enter a new owner's name on the records until he is supplied with either a probated will or decree of the Surrogate's Court, designating the decedent's successor in interest.

**6.** The redemption deadline date specified in the notice of foreclosure was January 5, 1983. However, because City officials must record payments tendered by delinquent taxpayers and

tered, and, on January 31, 1983, the City took title to the property. Later, Bender learned of the foreclosure. On April 18, 1983, he attempted to redeem the property. The City refused his tender of full payment of back taxes,[7] and, on April 20, 1983, the property was sold at public auction for $25,100.00, with the City retaining the entire proceeds.

## DISCUSSION

This appeal requires us to apply the standards announced by the Supreme Court in *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983), for determining the constitutional adequacy of notice given prior to governmental action that effects a deprivation of property. Prior to *Mennonite* the Court had ruled in a series of cases starting with the seminal decision in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), that due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314, 70 S.Ct. at 657; *see Greene v. Lindsey*, 456 U.S. 444, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982); *Schroeder v. City of New York*, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962); *Walker v. City of Hutchinson*, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956). The holding in *Mennonite* represents no departure from the flexible standard announced in *Mullane;* the Court ruled that mailed notice to a property owner plus notice posted in a county courthouse and published for three consecutive weeks was not sufficient to deprive a mortgagee of his interest in property sold to satisfy tax liens. The language in *Mennonite*, however, appears to add rigor to the *Mullane* standard: "Notice by mail or

other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party, whether unlettered or well versed in commercial practice, if its name and address are reasonably ascertainable." 462 U.S. at 800, 103 S.Ct. at 2712 (emphasis in original). Plainly the dissenters in *Mennonite* understood this language to announce a significant change from the standard of prior decisions. *See id.* (O'Connor, J., with whom Powell and Rehnquist, JJ., join, dissenting).

Yet we note that the majority in *Mennonite* made no claim that it was departing from the flexible standard of *Mullane*. Indeed, Justice Marshall's opinion for the Court asserts, "This case is controlled by the analysis in *Mullane*." *Id.* at 798, 103 S.Ct. at 2711. And, having characterized the mortgagee's interest as entitled to protection, *i.e.*, notice sufficient to meet the requirements of due process, Justice Marshall concludes that the mortgagee "is entitled to notice reasonably calculated to apprise him of a pending tax sale." *Id.* Apparently the majority was of the view that, when the name of a person with a protectable interest in property is "reasonably ascertainable," the notice that is "reasonably calculated" to inform him of the impending event is and must be notice by mail or other equivalent means. We are thus left with the task of applying the teaching of *Mennonite*, as reflected by its fairly straightforward holding, as well as its somewhat contradictory language.

Despite the fears of the *Mennonite* dissenters, we think the majority means what it says when it asserts that it is applying the *Mullane* analysis and that, though the standard may have become slightly more rigorous, the basic flexibility of the *Mul-*

---

prepare documents relating to foreclosure of parcels not redeemed, foreclosure judgments are usually entered several weeks after the redemption deadline. During these intervening weeks, it is the practice of the City Treasurer to continue accepting redemptions. In this case, the Treasurer accepted redemptions up to January 27, 1983, the day before the foreclosure

judgment on the Pembroke Street property was signed.

7. Had Bender been an occupant of 27 Pembroke Street, the City, pursuant to local practice, would have permitted him to redeem prior to the auction date, even though judgment of foreclosure had been entered.

*lane* standard has not been discarded. What the Court has done is shift the inquiry from whether under all the circumstances the notice was reasonably calculated to inform those with protectable interests to a more focused examination of whether the names of such persons are "reasonably ascertainable," in which event mail or equivalent notice is required. But though the focus of the inquiry may have shifted somewhat, the standard applicable to that inquiry has not. Thus, we do not believe that the inquiry as to whether a name is "reasonably ascertainable" can be made without regard to the general principles that underlie *Mullane* and its progeny. In *Mennonite* those principles yielded an obvious answer: The name of the mortgagee was reasonably ascertainable since it was readily identifiable from the land records. However, where, as in this case, the names of those with protectable interests are not recorded in the land records, a faithful application of both *Mullane* and *Mennonite* requires us to consider whether, under all the pertinent circumstances, it is reasonable to expect the City to have identified the names of the decedent's distributees. Whether such identification is reasonably to be expected depends not only on the burden the City would have to undertake but also on the likelihood that the names would be brought to the City's attention without undertaking such burden. Though language in *Mennonite* emphasizes that a party's ability to protect its own interests does not relieve the government of its due process obligations, *see* 462 U.S. at 799, 103 S.Ct. at 2712, the initial determination of what obligation due process imposes must take into account what the interested party, or someone obligated to act on its behalf, is likely to do. An inquiry into reasonableness normally entails a weighing of interests; a heavy burden to ascertain a name may be "reasonable" to undertake if the likelihood that the person will otherwise receive notice is very low, and a lighter burden may not be "reasonably" required if it is highly likely that actual notice will otherwise occur.

In this case, the names of the distributees of the decedent's property could have been identified by examination of the records of the office of the clerk of the Surrogate's Court. Such examination would have disclosed the death of the record owner of the property and the petitions for Letters of Administration for his estate, listing the distributees. Such inquiry would not be an onerous task; it would normally be performed by a competent title searcher in connection with a sale of the property, at least where circumstances present some basis for suspecting that the record owner has died. *See* 5A *Warren's Weed on the New York Law of Real Property*, Title Examination § 35.01 (4th ed. 1984). However, we note that an inquiry of this sort will not necessarily identify the successors in interest of the deceased owner of property. If the decedent did not reside in the same county where the property is located, the inquiry would be fruitless because there would be no record about the estate in the clerk's office of the Surrogate Court of that county. Even if the decedent resided in the same county, however, the identity of the successors in interest and the nature of their interests may not become clear until probate proceedings are complete. Beneficiaries may have conflicting claims, and, in some cases, their beneficiary status may be initially unknown to themselves and to the administrator. Moreover, though the burden of inspecting records of the Surrogate's Court is not heavy, it is a task beyond the routine examination of land records that was involved in *Mennonite*.

Turning to the other side of the "reasonableness" inquiry, we think the City was entitled to expect that those appointed to administer estates that include real property would place something on the land record to put the world on notice of the owner's death and would also obtain mail addressed to their decedent. Because in many cases it is impractical to expect a decedent's beneficiaries to act for themselves, state law provides for appointment of a fiduciary who is empowered to act on their behalf. *See In re Chisholm's Estate,*

177 Misc. 423, 30 N.Y.S.2d 870, 873 (Sur.Ct. 1941), *aff'd mem.*, 264 A.D. 793, 35 N.Y. S.2d 212 (App.Div.1942), *aff'd mem.*, 290 N.Y. 842, 50 N.E.2d 239 (1943). Bender, as administrator of his father's estate, had the legal duty to collect and preserve his father's assets, to pay his father's debts, and to account for his acts to the distributees and deliver to them their intestate shares. *See Kennedy v. Kennedy*, 91 N.Y.S.2d 294, 299, 22 Misc.2d 924 (Sup.Ct.1949). If an administrator is to fulfill these fiduciary obligations, it is entirely reasonable to assume that he will make some effort to obtain mail sent to his decedent. And if the mail contains a notice that the government is taking some action against property of the decedent, it is reasonable to assume that the administrator will take steps to preserve the property or, at the very least, inform the heirs of the pending proceeding so that they can protect their interests.

In light of all of the pertinent circumstances, we do not believe the names of the distributees were reasonably ascertainable for purposes of applying *Mennonite* and determining whether due process required the City to mail them notices. Our analysis is entirely consistent with the holding in *Mennonite.* The Supreme Court's concern that the mortgagee was not likely to receive actual notice arose from the fact that the mortgagor, who did receive mailed notice, was said not to be in "privity" with his mortgagee. 462 U.S. at 799, 103 S.Ct. at 2711. The privity that was lacking in *Mennonite* clearly is present in this case.[8] The administrator of a decedent's estate is in privity both with the decedent and with the decedent's beneficiaries. *See* 1B *Moore's Federal Practice* ¶ 0.411[12] (1984). Unlike a mortgagee who will not learn of the contents of his mortgagor's mail unless the mortgagor chooses to inform him, an administrator will always, if he is fulfilling his legal duties, take steps to receive the decedent's mail, learn of proceedings pending against the decedent's property, and

inform the decedent's heirs of those proceedings. Moreover, unlike a mortgagor who has failed to protect his own interest in mortgaged property and who has no incentive to inform his mortgagee of a pending foreclosure sale, the administrator is legally obligated to preserve the decedent's assets and, in order to protect himself from liability for breach of fiduciary duty, to inform the heirs of pending proceedings.

The judgment of the District Court is affirmed.

---

**8.** Since a mortgagor and mortgagee are in contractual privity, we assume that, by stating that they are not in privity, the Supreme Court

meant only that their relationship is not such that notice to one should be imputed to the other.