Elbert SALLIE and Diana Marshall, Plaintiffs,

v.

TAX SALE INVESTORS, INC., William R. Brown, Jr. Director of Finance, Collector of Taxes for Baltimore City, in his Official Capacity, and John W. Anderson, Sheriff of Baltimore City, in his Official Capacity, Defendants.

No. CIV. AMD 97–2922.

United States District Court, D. Maryland.

March 19, 1998.

Andrew David Freeman, Brown, Goldstein & Levy, Baltimore, MD, for Elbert Sallie, Diana Marshall.

Julie Ellen Squire, Gallagher, Evelius & Jones, Baltimore, MD, for Tax Sale Investors, Inc.

Burton H. Levin, Kathryn E. Kovacs, Baltimore, MD, for William R. Brown, Jr.

Lawrence Paul Fletcher–Hill, Office of the Attorney General, Baltimore, MD, for John W. Anderson.

## MEMORANDUM

DAVIS, District Judge.

## I. INTRODUCTION

As a consequence of their landlord's failure to pay the real estate taxes due on the house he had leased to them, plaintiffs Elbert Sallie and Diana Marshall were evicted from their home of many years without actual notice, and their personal property was deposited on the street to be damaged, if not appropriated, by casual passersby. Seeking relief for such indignity in this action filed pursuant to 42 U.S.C. § 1983, they have asked this Court to declare Maryland's tax sale statute, MD. CODE ANN., TAX-PROP. §§ 14–808–14–850 (1994 & Supp.1997), ("the tax sale statute") unconstitutional, in that it authorized and encouraged the deprivation of their legal and possessory interests in their home without due process of law in violation of the Fourteenth Amendment of the United States Constitution. Specifically, they seek to enjoin the State and Baltimore City from holding tax sales of real property without sending notice by mail to all tenants, and they seek damages from the corporate purchaser of the property (their new landlord) which procured and effected their unexpected summary eviction.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3) and 1367. The three defendants are: William R. Brown, Jr., Director of Finance for Baltimore City ("Brown") and John W. Anderson, Sheriff of Baltimore City ("Anderson"), who are sued in their official capacities only, and against whom only prospective injunctive and declaratory relief has been requested; and Tax Sale Investors, Inc. ("TSI"), the private corporation that acquired title to the plaintiffs' home under the state tax sale statute, against which damages are sought. In addi-

tion to the federal claims, plaintiffs also assert state law claims against TSI.

Pending before the Court are the following motions: (1) plaintiffs' motions for a preliminary injunction and for summary judgment; (2) Anderson's cross-motion for summary judgment; (3) Brown's motion to dismiss; and, (4) TSI's motion to dismiss or in the alternative, for summary judgment. A non-evidentiary hearing was held on January 23, 1998. As I explain below, I am persuaded that the tax sale statute was applied constitutionally insofar as it authorized the extinguishment of plaintiffs' *unrecorded leasehold interest* in their home merely on the basis of constructive notice by publication. On the other hand, I am persuaded that the record as it now stands, barren of full factual development, does not permit an informed and rational determination as to whether Supreme Court and Fourth Circuit precedent does or does not prohibit mere constructive notice by publication (or, perhaps, by posting) as a predicate for defendants' summary eviction of plaintiffs from their home, i.e., extinguishment of the plaintiffs' *possessory interest* in their home.

■ Accordingly, I shall grant Brown's motion to dismiss because he was not involved, in any respect, in the delivery to TSI of actual possession of (and consequent eviction of the plaintiffs from) the property purchased at the tax sale by TSI. In contrast, I shall deny Anderson's cross-motion for summary judgment because he is the sole governmental official with the power and authority to deliver possession of real property to tax sale purchasers, and he performed that role, acting through one of his deputies, in this case. It cannot be said at this juncture, as a matter of law, that declaratory relief against Anderson is inappropriate.

Moreover, I am persuaded that TSI's acts and omissions in this case might well be deemed (after full discovery) to constitute action "*under color of law*" as required by 42 U.S.C. § 1983, as that statute has been applied in Supreme Court and Fourth Circuit precedent. In sum, then, I conclude, for the reasons stated below, that TSI's motion to dismiss or in the alternative for summary judgment as to plaintiffs' damage claims must be denied, as there exists genuine disputes of fact as to: (1) whether, under the circumstances of this case, TSI's purchase of the property at tax sale and its subsequent involvement (with a deputy sheriff) in effecting plaintiffs' summary eviction made TSI a "state actor" or (what is the same thing) constituted action "under color of law," making TSI amenable to suit under 42 U.S.C. § 1983, and (2) whether plaintiffs received constitutionally adequate notice of their imminent eviction.

## II. FACTS

■ With the agreement of the parties, despite the lack of discovery, I have considered material outside the pleadings, and so I shall treat the defendants' motions as motions for summary judgment, and I shall set forth the facts in the light most favorable to the nonmovant as to each motion.[1]

In 1989, Elbert Sallie and his wife leased from Mohammed Gazi, a resident of Florida, the premises at 4800 Claybury Avenue in Baltimore, Maryland, a single family residence. After their one-year lease expired, the Sallies remained in the premises with Gazi's permission, paying monthly rent and continuing as month-to-month tenants. After Mrs. Sallie died, Mr. Sallie's cousin, Diana Marshall, joined him as a tenant. Mr.

---

1. Of course, where, as in the instant case, both or all parties file motions for summary judgment, the court applies the same standard of review to each motion as would apply if only one such motion were filed. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment.") (empha-

sis omitted), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). Rather, the role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Management Corp. v. Hartford Accident & Indem. Co.*, 627 F.Supp. 170, 172 (D.Md.1985) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2720).

Sallie and Ms. Marshall paid rent faithfully and timely by mail to Gazi, but, unbeknownst to them, Gazi failed to pay his property taxes on the Claybury Avenue house. By spring 1992, Gazi was seriously in default and the lien securing the unpaid taxes was sold at auction. Ultimately, in 1996, TSI obtained title to the property under the Maryland tax sale procedures described below.

Maryland law provides that unpaid taxes on real estate constitute a lien on that property. MD. CODE ANN., TAX-PROP. § 14–804 (1994 & Supp.1997). Generally, within two years from the date taxes go into default (although not in Baltimore City), the local tax collector, here defendant Brown, must sell the property. *Id.* § 14–808(a). The record owner of the property is entitled to notice by mail at least thirty days before the property is first advertised for sale. *Id.* § 14–812. In addition, the local tax collector must publish in a newspaper having a general circulation in the jurisdiction in which the property is located, for a specified number of weeks, notice that the property will be sold at public auction. *Id.* § 14–813(a).

After the sale is properly advertised, the property is sold by the local tax collector at public auction. *Id.* § 14–817(a). The purchaser of the property is given a certificate of sale, which contains a description of the property, the date of the sale, the total amount of taxes due on the property at the time of the sale, the amount for which the property was sold, and information as to the time within which an action to foreclose the owner's right of redemption must be brought. *Id.* § 14–820(a). The holder of a certificate of sale may file a complaint to foreclose the right of redemption no earlier than six months from the date of the tax sale. *Id.* § 14–833(a). Such an action must be filed within two years or the certificate is void. *Id.* § 14–833(c).

In connection with a suit to foreclose the right of redemption, the tax sale statute mandates that certain putative defendants be specifically named. They are the record title holder of the property, including the owner of any ground rent, any mortgagee under a recorded mortgage, the trustee under any recorded deed of trust, the county where the property is located, and if appropriate, the state. *Id.* § 14–836(b)(1)(i)–(vi). "[I]t is not necessary to name as defendant any other person that has or claims to have any right, title, interest, claim, lien or equity of redemption in the property sold by the collector." *Id.* § 14–836(b)(3). "[T]hese persons are included as defendants by the designation 'all persons that have or claim to have any interest in [the] property . . . .' " *Id.*

The statute requires that notice of an action to foreclose the right of redemption be provided in several ways. First, the named defendants must be served with a "summons . . . as in other civil actions" or "in any other manner that results in actual notice of the pendency of the action to the defendant." *Id.* § 14–839(a)(3), (a)(5). Second, notice must be provided by publication, that is, the complaint must include a request for an order of publication, § 14–835(a)(5), and the court is directed to pass an order of publication when it issues the summonses to the named defendants. *Id.* § 14–840. In the case *sub judice*, this publication notice (together with the earlier advertisements of the auction, which occurred in 1992) was the only notice plaintiffs "received."

The statute identifies another group of defendants entitled to notice by mail. This group consists of "all persons having a recorded interest, claim, or lien, including a judgment, who have not been made a defendant in the proceeding." *Id.* § 14–836(b)(4)(i). These persons with recorded interests other than title holders, mortgagees, or trustees under a deed of trust are subsumed within the general description of " 'all persons that have or claim to have any interest in [the] property,' " *Id.* § 14–836(b)(3), but the fact that they have recorded interests entitles them to notice by certified mail. The plaintiff must also provide notice of the institution of the foreclosure action to the local tax collector. *Id.* § 14–839(c).

If judgment is rendered for the plaintiff foreclosing the right of redemption, the "judgment vests in the plaintiff an absolute and indefeasible title in fee simple in the property, free and clear of all alienations and descents of the property occurring before the

date of the judgment and encumbrances on the property ...." *Id.* § 14–844(b). The holder of the certificate of tax sale may then obtain a deed to the property from the local tax collector upon payment of the balance of the purchase price, together with all taxes, interest, and penalties accrued after the date of the tax sale. *Id.* § 14–847(a).

The holder of the deed, in turn, may obtain a writ of a possession of the property from the clerk of the circuit court. *Id.* § 14–850; Md. Rule 2–647. The writ directs the local sheriff, here Anderson, to place that party in possession of the property. MD. CODE ANN. CTS. & JUD. PROC. § 2–301 (1995).

TSI, and/or its predecessors in interest, followed these procedures without fail. Upon obtaining title under the tax sale statute in June 1996, TSI caused a writ of possession to be delivered to the Sheriff's Office for execution. (Allegedly, the Baltimore City Sheriff's Office had in 1996, and has today, a practice of not executing a writ of possession in a tax sale matter without first posting a letter on the door of a residence at least five days before the writ is to be executed. The letter advises the occupant to vacate the premises by an order of the circuit court. Deputy Sheriff Phillip G. Borowski's affidavit indicates that he believes that he posted a letter at the home of the plaintiffs, at least five days prior to serving the writ of possession on August 16, 1996, in accordance with the policy of the Baltimore City Sheriff. Mr. Sallie and Ms. Marshall affirm, however, that they never received the letter and had no prior knowledge of the eviction scheduled for August 16, 1996. For present purposes, because plaintiffs are entitled to all favorable inferences, I shall disregard the claim that the letter was posted. Even if such a letter were posted, however, it is not clear, as discussed *infra*, that such posting satisfies the demands of due process.).

When Mr. Sallie arrived home during the noon lunch hour on August 16, 1996, to his dismay he found that he and Ms. Marshall were shut out of their home and their belongings were on the street or in the alley nearby. No representative of the Sheriff's Office was present, and one of the crew carrying out the eviction directed Mr. Sallie to the

offices of TSI. Later that very afternoon, TSI permitted Mr. Sallie and Ms. Marshall to move back into their home under a new lease agreement which required them to pay a $500 security deposit and a $35 rent increase to $500 monthly.

## III. ANALYSIS

### A. SUFFICIENCY OF CONSTRUCTIVE NOTICE BY PUBLICATION OF THE TAX SALE AUCTION AND OF THE COURT PROCEEDINGS TO FORECLOSE THE RIGHT OF REDEMPTION

■ Plaintiffs do not dispute that defendants complied strictly with Maryland law. Plaintiffs contend, however, *inter alia,* that due process required that defendants send them notice by mail at the three discrete stages of the tax sale process: (1) before the sale at auction of the tax lien certificate for 4800 Claybury Avenue in spring 1992; (2) at the institution of the action in state court to foreclose the right of redemption in May 1994; and (3) prior to the execution of the writ of possession obtained by TSI by virtue of the judgment foreclosing the right of redemption in August 1996. Their claims are based squarely on their interpretation and application of the Supreme Court's decision in *Mennonite Board of Missions v. Adams,* 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983).

In *Mennonite,* the Supreme Court interpreted Indiana's tax sale statute and addressed the issue of "whether notice by publication and posting provides a mortgagee of real property with adequate notice of a proceeding to sell the mortgaged property for nonpayment of taxes." *Id.* 462 U.S. at 792. Of significance in *Mennonite* was the fact that the mortgagee had a recorded security interest, but the Indiana tax sale law failed to require that notice by mail of the tax sale and process for redemption be given to the mortgagee. The Court held that a mortgagee has a substantial property interest that is significantly affected by a tax sale because the tax sale *"immediately and drastically* diminishes the value of this security interest by granting the tax-sale purchaser a lien with priority over that of all other creditors." *Id.* 462 U.S. at 798 (emphasis added). The

Court ultimately held that "[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interest of any party, whether unlettered or well versed in commercial practice, *if its name and address are reasonably ascertainable.*" *Id.* at 800 (emphasis added).

In the case at bar, the plaintiffs' argument is straightforward: they are like the mortgagee in *Mennonite* because both the tax sale and the state court action to foreclose the right of redemption jeopardized their leasehold interest in the property. They argue that, at a minimum, notice by mail is required prior to the tax sale because the sale may (and did) result in the termination of their unrecorded leasehold interest. They argue further that the court action to foreclose the right of redemption changed the character of their property interest from a month-to-month tenancy to one of no lease, subject to immediate eviction. Plaintiffs contend that had they received actual notice of the tax sale and/or had they been formally joined as party defendants in the foreclosure action, they would have had an opportunity to pay the taxes, press the landlord to pay the taxes, or redeem the property themselves, as Maryland law allows. MD. CODE ANN., TAX-PROP. § 14–808 (1994 & Supp. 1997).

Defendants vigorously contest plaintiffs' assertion that the tax sale statute's provision for constructive notice by publication to tenants in possession under an unrecorded leasehold is unconstitutional. They contend that the constructive notice provided for in the tax sale statute is constitutionally sufficient.[2] Relying on principles espoused in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), on which *Mennonite* was directly based, 462 U.S. at 795–98, defendants argue that the determination of what amounts to constitutionally sufficient notice requires a careful balancing of the state's significant interests in resorting to notice by publication in the tax sale context, against the plaintiffs' interest in the continuation of their limited leasehold (and the speculative possibility that a tenant might actually redeem the property), and the practical costs and burdens which would result from a rule requiring that the local tax collector and/or the tax sale purchaser conduct research to discover the identities of tenants in possession under unrecorded short-term leases. Defendants contend that the state's significant interest in facilitating the collection of delinquent taxes, and the practical difficulty of identifying tenants under unrecorded leases, justify the provision authorizing notice by publication to tenants having an unrecorded interest.

Defendant Brown also emphasizes that the actual tax sale does not affect a tenant's interest in *possession* of the property; and, moreover, it is not until judgment is rendered in favor of a tax sale purchaser at the end of the foreclosure action that a tenant's legal interest is truly adversely affected. Defendants further contend that, at most, notice provided at the earlier stages of the process would inform a tenant of the tax delinquency and conceivably give the tenant the option of redeeming the property, and that "those more attenuated interests are met by advertisement of the tax sale." Mem. Supp. Cross–Mot. Summ. at 14.

Defendants Anderson and TSI contend, further, that the tax sale process is a unitary process, and that plaintiffs' contention that notice should be afforded at each discrete stage of the process must be rejected. As defendant Anderson puts it, "[t]he ultimate consequence of the proceeding [i.e., the plaintiffs' eviction] does not introduce an additional due process interest or notice requirement not present at the time the action is initi-

---

2. Defendants note that the Maryland Legislature amended the notice provisions of the tax sale statute in response to the *Mennonite* decision, and that the statute has survived federal constitutional challenges in several state court proceedings. *See St. George Antiochian Orthodox Christian Church v. Aggarwal*, 326 Md. 90, 603 A.2d 484 (1992); *Ayres v. Townsend*, 324 Md. 666, 598 A.2d 470 (1991); *Scott v. Seek Lane Venture, Inc.*, 91 Md.App. 668, 605 A.2d 942, *cert. denied*, 327 Md. 626, 612 A.2d 257 (1992). None of these cases, nor any other case cited to or found by this court, involved a challenge by a tenant who was actually summarily evicted from the premises at the request of the tax sale purchaser.

ated." Mem. Supp. Cross–Mot. Summ. at 15. Defendant Anderson also argues that his policy of giving posted notice five days in advance of an eviction exceeds constitutional requirements, and that, in any event, it is ultimately a legislative judgment, and not one within judicial cognizance, whether additional notice ought to be provided.

I have carefully considered the parties' conflicting arguments. I am persuaded that plaintiffs' situation in the case at bar differs significantly from that of the mortgagee in *Mennonite.* In *Mennonite,* the Court was confronted with a plaintiff who had a recorded security interest in property that was sold at tax sale. Not only was the plaintiff's identity and address readily ascertainable from a cursory examination of the land records, but the tax sale and foreclosure proceedings immediately diminished the mortgagee's financial and legal interests in the property. Here, plaintiffs' leasehold interest was not recorded, and it would have been difficult, to say the least, for the tax collector or a prospective bidder at the tax sale auction to learn the names of tenants.[3] And, defendants are correct to note that neither plaintiffs' leasehold interest nor their possessory interest in the property was actually affected by the tax sale. The purchase of their home by TSI merely transferred an existing lien against the property. Gazi, the original landlord, still held title to the property and the plaintiffs remained on the premises as month-to-month tenants. In fact, plaintiffs remained in possession of the premises for more than four years after the tax sale. The fact that plaintiffs remained as tenants even after the action to foreclose the right of redemption was instituted establishes that their possessory interests were not affected by the foreclosure action itself. Indeed, but for the ill-advised summary eviction, plaintiffs' enjoyment of possession would have continued without interruption or interference. *See infra* pp. 13–15.

■ Thus, contrary to plaintiffs' contention, I am constrained to the view that neither the holding nor the rationale of *Mennonite* undermines the presumed constitutionality of Maryland's election to employ constructive notice by publication to extinguish the unrecorded leasehold interest of one in actual possession of real property in a tax sale setting. The *Mennonite* decision is rooted in principles enunciated in *Mullane,* in which the Supreme Court held that "notice [must be] reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present objections." *Mullane,* 339 U.S. at 314. The reasonableness of a particular method of notice requires a balancing of "th[e] interest of the State" and "the individual interest sought to be protected by the Fourteenth Amendment." *Id.; see also Bender v. City of Rochester, N.Y.,* 765 F.2d 7, 10–12 (2d Cir.1985) (analyzing *Mennonite*'s reinvigoration of the *Mullane* balancing test).

Applying the *Mullane/Mennonite* test here, I am persuaded that Maryland has a significant interest in encouraging participation in its tax sale program and in decreeing marketable title. Further, Maryland's tax sale mechanism is an effective means of collecting property taxes for the state, and is critical to the state's need to provide a source of revenue for a host of governmental services provided to its citizens. Requiring a local tax collector or a tax sale purchaser to identify holders of unrecorded interests at the early stages of the process would be extraordinarily burdensome, and would very likely discourage prospective purchasers from participating in tax sales. If this were to happen, the state's significant interest in combating abandonment of properties, especially in urban areas, and in securing for its citizens the revenue necessary to carry out

**3.** Plaintiffs seem to make an argument that notice by mail addressed to "Occupant" or "Tenant" would satisfy what they contend is the minimum form of notice the Constitution can tolerate. I reject this contention. There is no support for such a conclusion in any precedent cited to or found by this court, and certainly not in *Mennonite.* Such a mailing would likely be disregarded as additional "junk mail" by most recipients. As a matter of law, such a "generic" notice is not more likely to result in the receipt of actual notice by tenants, and the prospect of such notice does not alter the balance struck in this case in any way.

important governmental functions, would be frustrated.

Thus, although it is undisputed that plaintiffs had a constitutionally protected property interest in respect to their month-to-month lease agreement on the premises at 4800 Claybury Avenue, the state's interest in an efficacious tax sale regime outweighed plaintiffs' interest in receiving notice by mail before their limited leasehold interest was extinguished attendant to the tax sale process. They remained in possession of their home and were only displaced when the deputy sheriff and TSI executed the writ of possession. Under these circumstances, the notice requirements of the tax sale law are constitutionally sufficient insofar as notice by publication is employed as a predicate for the extinguishment of their unrecorded legal interest in their residence. I turn now to examine whether plaintiffs' *possessory* interest was validly summarily terminated on the strength of the notice by publication, which I have concluded was constitutionally sufficient to justify termination of their *legal* interest.

B. SUFFICIENCY OF THE NOTICE OF THE SUMMARY EVICTION

■ Plaintiffs have specifically challenged the adequacy of notice by publication at each discrete stage of the tax sale process, and appropriately so. In contrast to my view, expressed above, as to the adequacy of publication notice in the early stages of the tax sale process, I am not persuaded that, as a matter of law, plaintiffs received constitutionally adequate notice of the actual summary eviction, which was the ultimate outcome of their landlord's default in the payment of real property taxes.

Defendants contend that notice of the eviction was not required because the execution of the writ of possession is merely a continuation of the tax sale process and constitutionally sufficient notice was provided early on in that process. Furthermore, they maintain that, on the present record, even if more substantial notice of the eviction was required, the notice posted by the Sheriff's deputy was adequate. Although, as I explain below, the summary judgment record is too scanty to justify resolution of this aspect of the dispute as a matter of law, it is plain that defendants are almost certainly wrong in their contentions.

The *threat or prospect* of eviction, if an injury at all, is an injury different by several degrees of magnitude from an *actual* eviction. There is, of necessity, therefore, a difference of constitutional dimension between the deprivation of the *right* to possess one's home, and the dispossession effected by an actual physical eviction. It is one thing to divest a month-to-month tenant of her leasehold; it is quite another thing to enter a tenant's home forcibly in her absence, remove her belongings and leave them strewn about the street, free for the taking.

Constructive notice by publication afforded years or even months in the past hardly seems to equate to due process. In an analogous context, in *Richmond Tenants Organization, Inc. v. Kemp,* 956 F.2d 1300, 1307 (4th Cir.1992), the Fourth Circuit held:

> Since the immediate and summary eviction of tenants is a ... serious constitutional deprivation ..., in the absence of exigent circumstances, the Due Process Clause ... requires the government to provide for notice and an opportunity to be heard before a tenant may be evicted.

*See also id.* at 1306 ("This Court agrees that, absent exigent circumstances, no-notice evictions violate due process."). Under the circumstances here, since the notice by publication of the tax sale and the subsequent court proceedings to foreclose the right of redemption *were entirely silent on the issue of physical eviction,* it is arguably more logical (and more realistic) to regard the eviction in this case as a "no-notice" eviction. But I need not go so far.

In *Greene v. Lindsey,* 456 U.S. 444, 455–56, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982), the Supreme Court held that where public housing tenants are faced with eviction in forcible entry and detainer actions, even posted notice is constitutionally inadequate, in view of the ready availability of mail service. *See Kornblum v. St. Louis County, Missouri,* 72 F.3d 661, 664 (8th Cir.1995) (en banc) ("Posting is an especially ephemeral means of giving notice ...."). It is extraordinary here

that the plaintiffs were put to such an indignity utterly without cause or reason, and defendants have not even attempted to suggest a governmental or private interest amounting to "exigent circumstances." *See Kemp, supra.* From its very name, *Tax Sale Investors, Inc.,* it appears that TSI is heavily involved in the real estate business. Although it disclaims heavy involvement in the tax sale program operated by Maryland, it is remarkable that it was able to enter into a new lease agreement with the plaintiffs on the very afternoon of the disputed eviction. Once it obtained title to the Claybury Avenue property, it is inexplicable on the present record, why, other than mere bureaucratic arrogance and obliviousness, a simple visit to the newly-obtained property was not arranged before sending out the sheriff with a "put-out" crew. Surely, if the plaintiffs had been at home, some more reasonable arrangement would have been agreed to, as in fact TSI presently concedes, and as in fact occurred after Mr. Sallie returned home for lunch, post-eviction.

■ Thus, given the magnitude of the indignity and the loss of personalty attendant to an eviction without notice, it is indisputable that plaintiffs are entitled to insist upon a genuine effort to provide notice having a substantial degree of effectiveness at a meaningful time prior to the eviction. "As *Mullane* plainly put it, '[t]he means [of notice] employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.' 339 U.S. at 315, 70 S.Ct. at 657–58." *Elmco Properties, Inc. v. Second Nat'l Fed. Sav. Ass'n,* 94 F.3d 914, 921 (4th Cir.1996) (finding due process violation in failure to provide mail notice of

administrative claims process in connection with disposition of escrow funds by receiver of failed savings and loan). At least this much was plaintiffs' due.

*Greene, Kemp* and similar cases involve circumstances in which the tenant (or a member of her family) has largely, if not entirely, caused the eviction proceedings to occur. In other words, where a tenant fails to pay rent or otherwise breaches a lease, or remains in possession after a lease terminates, clearly she is in a position to anticipate that legal process is likely to be invoked by the landlord to obtain relief from the courts. Here, in sharp contrast, the tenants were not in breach of any agreement and had no reason to suspect that legal procedures had been engaged by the owner of the premises (whoever that might be) to regain possession of the leased premises. It is difficult to imagine that such a tenant could be less entitled to a means of notice with a high likelihood of providing actual notice than a tenant who fails to pay rent or who commits a willful breach of a rental agreement.

In this case, even viewed in the light most favorable to defendants, which would not be appropriate in this summary judgment context, the only notice that was given purportedly was the notice posted on their door by the deputy sheriff five days before execution of the writ of possession, and even that contention is controverted by plaintiffs. For present purposes, I am bound to conclude that plaintiffs did not receive the notice that was posted by the Sheriff.[4] Whether the deputy sheriff actually posted the notice and whether, if so, the posted notice was constitutionally sufficient under the circumstances of this case are questions that must be ad-

---

4. Maryland law now requires a tax sale purchaser to post a notice in a conspicuous place on the property that a complaint to foreclose the right of redemption has been filed. Md. Rule 14–503(c). The notice must include "the substance of the complaint and the relief sought, ... a description of the property ... the time within which a defendant must file an answer to the complaint or redeem the property, and ... a statement that failure to answer or redeem the property within the time allowed may result in a judgment foreclosing the right of redemption." Md. Rule 14–503(c), 14–502(b)(3).

For this and other reasons apparent in the text and mentioned at the hearing, I am not persuad-

ed that the rather limited potential for relief to which plaintiffs may be entitled justify the issuance of a preliminary injunction. Certainly, the named plaintiffs are not entitled to a preliminary injunction, for an injunction against future evictions without notice would not likely inure to the benefit of the named plaintiffs. I am convinced, frankly, that this litigation has genuinely alerted those involved in the tax sale process in Maryland to the large potential for grave injustice to innocent tenants, and that the misfortune that has befallen the plaintiffs here is unlikely to be repeated. *See also infra* n. 9.

dressed upon further development of the factual record, perhaps on summary judgment or at trial.

Appellate courts have indicated a preference for factual development of Fourteenth Amendment notice claims. *See, e.g., Sams v. City of Milwaukee, Wis.,* 117 F.3d 991, 993–94 (7th Cir.1997) ("Whether a particular method of notice is reasonable depends on the particular circumstances."). (vacating summary judgment). This approach is sound. It would seem to be indisputable that the "particular circumstances" here might include the appearance and condition of the real property and its contents and the state of mind of TSI's agents at the time of the state court foreclosure proceedings and at the time of the eviction. It would be relevant to know, as well, whether the deputy sheriff actually posted the property, and if so, what the notice actually recited, and whether there was reason to suspect that the notice would not be received. These are only a few of the questions which would inform a determination of "whether a particular method of notice [was] reasonable."

C. TSI'S AMENABILITY TO SUIT UNDER 42 U.S.C. § 1983

Plaintiffs assert § 1983 damage claims against TSI, contending that TSI acted "under color of law" when (pursuant to the tax sale law) it obtained title to plaintiffs' home, and more particularly, when (with the assistance of the deputy sheriff) it forcibly evicted them from their home with no prior actual notice. They maintain that as a result of the eviction, their possessions were thrown onto the street and looted. In addition to their § 1983 claim against TSI, plaintiffs have asserted claims under state law.

■ To prevail in an action brought under 42 U.S.C. § 1983, plaintiffs must show that they were deprived of a right secured by the Constitution or laws of the United States, and that the defendant acted under color of state law. *Conner v. Donnelly,* 42 F.3d 220, 223 (4th Cir.1994); *Haavistola v. Community Fire Co. of Rising Sun, Inc.,* 6 F.3d 211, 214–15 (4th Cir.1993). TSI, a private entity, can only be held liable under 42 U.S.C. § 1983 for activity that constitutes state ac-

tion. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (private defendants invoking state replevin, garnishment, and attachment statutes later declared unconstitutional act under color of state law for § 1983 liability purposes); *Hafer v. Melo,* 502 U.S. 21, 28, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)("[I]n § 1983 actions the statutory requirement of action 'under color of' state law is just as broad as the Fourteenth Amendment's 'state action' requirement." (citing *Lugar*)).

Although TSI joins in the defense of the constitutionality of the tax sale statute advanced by the governmental defendants, it contends primarily that it cannot be held liable for plaintiffs' alleged injuries as a matter of federal law, and seeks dismissal of the federal claims against it, on two grounds: (1) its involvement in the matters in dispute did not constitute state action; and (2) it is entitled to a "qualified, good faith immunity" defense. *See* TSI's Opp'n Pls.' Mot. Prelim. Inj. at 4. Neither of these arguments support a grant of summary judgment in favor of TSI on the present record.

■ As to the latter contention, that TSI is entitled to a "qualified, good faith immunity," this admixture by TSI of the distinct qualified immunity enjoyed by a governmental actor sued in his or her individual capacity, and the common law affirmative defense of good faith, is puzzling. In any event, in *Richardson v. McKnight,* —— U.S.——, 117 S.Ct. 2100, 2108, 138 L.Ed.2d 540 (1997), and *Wyatt v. Cole,* 504 U.S. 158, 167, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992), the Supreme Court has made it clear that qualified immunity is not available to private defendants sued under § 1983. Moreover, since the qualified immunity defense does not extend to municipal corporations or to claims against state actors in their official capacities, *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 165–67, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), it cannot be expected that the Supreme Court will allow a *private business corporation,* as distinct from its *officers and employees,* to claim the benefits of qualified immunity. As to the good faith defense, it is manifest that TSI has failed to offer a basis

at this stage of the case upon which it might be concluded as a matter of law that it is entitled to the affirmative defense of good faith. Plaintiffs are entitled, at the least, to discovery on that issue.

■ On the issue of whether TSI acted "under color of law," TSI invokes a line of cases from the Supreme Court and the Fourth Circuit which have established a taxonomy of three "state action" paradigms or tests to argue that its actions in this case fit none of the classic private party scenarios, and that therefore liability may not be imposed upon it under 42 U.S.C. § 1983.[5] Thus, TSI contends that since it: (1) leased no public property; (2) was an unregulated, private entity receiving no public funds; and, (3) exercised no sovereign power, but simply followed the procedures mandated by the state tax sale statute in purchasing the property and in requesting that the Sheriff execute the writ of possession, it did not act "under color of law." According to TSI, only a "strange" judge, TSI's Opp'n Pls' Mot. Prelim. Inj. at 4, could conclude that it acted "under color of state law" in the circumstances presented here.

Strange or not, I reject TSI's contentions because TSI has resorted to a line of authority which is inapplicable to this case. In situations such as that presented here, in which a private party acts *in concert and jointly* with an admitted governmental actor, it is the line of authority traced to the Supreme Court's *Lugar* decision which is controlling, and not that line of cases in which a private entity acts unilaterally and without the actual involvement of a governmental actor. Both the Supreme Court[6] and the

---

5. *Chief Judge Motz recently summarized this line of authority in a case presenting the issue whether a volunteer fire company committed "state action" when it discharged a member and observed:*

> The courts have derived three tests for determining if particular conduct by a private entity constitutes state action: (1) the symbiotic relationship test, (2) the regulation/public funding test, and (3) the public function test. *See generally Conner v. Donnelly*, 42 F.3d 220, 223–24 (4th Cir.1994). In *Haavistola v. Community Fire Co. of Rising Sun*, 6 F.3d 211, 215–16 (4th Cir.1993), the Fourth Circuit ruled that the symbiotic relationship test applies only where a private entity is a lessee of public property, and that in Maryland volunteer fire departments are not so extensively regulated as to become state actors. Therefore, the question narrows to whether Chestnut Ridge can be deemed to be a state actor under the public function test.
>
> In applying this test it is not sufficient merely to ask "whether a private group is serving a 'public function.' ... [T]he question is whether the function performed has been 'traditionally the exclusive prerogative of the State.'" *Rendell–Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982) (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353, 95 S.Ct. 449, 455, 42 L.Ed.2d 477 (1974)). This question is not always easy to answer. As noted by the Fourth Circuit in *Haavistola*,
>
>> [r]eview of the ... precedents and decisions does little to simplify the issue of when a private entity assumes the role of state actor due to its involvement or provision of an exclusive public function. The cases inform the analysis in two ways: first, the determination is a factually intense analysis; and

second, its outcome hinges on how a given state itself views the conduct of the function by the private entity. 6 F.3d at 218.

*Goldstein v. The Chestnut Ridge Volunteer Fire Co.*, 984 F.Supp. 367, 368 (D.Md.1997).

6. In *Wyatt*, 504 U.S. at 161–62, the Court reasoned as follows in part:

> In *Lugar v. Edmondson Oil Co.*, ... the Court considered the scope of § 1983 liability in the context of garnishment, prejudgment attachment, and replevin statutes. In that case, the Court held that private parties who attached a debtor's assets pursuant to a state attachment statute were subject to § 1983 liability if the statute was constitutionally infirm. Noting that our garnishment, prejudgment attachment, and replevin cases established that private use of state laws to secure property could constitute "state action" for purposes of the Fourteenth Amendment, [*Lugar*, 457 U.S.], at 932–935, 102 S.Ct., at 2751–2752, the Court held that private defendants invoking a state-created attachment statute act "under color of state law" within the meaning of § 1983 if their actions are "fairly attributable to the State," *id.*, at 937, 102 S.Ct., at 2753. This requirement is satisfied, the Court held, if two conditions are met. First, the "deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Ibid.* Second, the private party must have "acted together with or ... obtained significant aid from state officials" or engaged in conduct "otherwise chargeable to the State." *Ibid.* The Court found potential § 1983 liability in *Lugar* because the attachment scheme was created by the State and because the private defendants,

Fourth Circuit [7] have made this distinction clear.

Notwithstanding the force of this authority, I am persuaded that a more thorough factual development is needed to inform any judgment as to whether TSI's involvement in Maryland's tax sale scheme, and in particular, whether its involvement in the decision and processes of eviction at the tail end of that scheme, renders its acts and omission "state action." See Goldstein, 984 F.Supp. at 368–69(noting that a "state action" issue is sometimes a question of fact).

Some observations are made salient even on this limited record. Indisputably, TSI acted jointly with the deputy sheriff, a governmental employee, to divest plaintiffs of their interest in their home. See Lugar, 457 U.S. at 942 (private party's joint participation with state officials in the seizure of property is sufficient to characterize that party as a "state actor" for the purposes of the Fourteenth Amendment); see also Kennedy v. Widdowson, 804 F.Supp. 737, 740 (D.Md. 1992) (private defendant's joint participation with police officers in removing property from plaintiffs' home made him a state actor). It is notable that when Mr. Sallie appeared at his home during the noon hour in the midst of the eviction, there was no

in invoking the aid of state officials to attach the disputed property, were "willful participant[s] in joint activity with the State or its agents." Id., 457 U.S. at 941, 102 S.Ct. at 2756 (internal quotation marks omitted). See also Georgia v. McCollum, 505 U.S. 42, 63, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (O'Connor, J., dissenting) ("In Lugar ... the Court developed a two-step approach to identifying state action in cases such as this. First, the Court will ask "whether the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority...." Next, it will decide whether, on the particular facts at issue, the parties who allegedly caused the deprivation of a federal right can "appropriately" and "in all fairness" be characterized as state actors"); Edmonson v. Leesville Concrete Co., Inc., 500 U.S. 614, 620–23, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) ("We begin our discussion within the framework for state-action analysis set forth in Lugar .... There we considered the state-action question in the context of a due process challenge to a State's procedure allowing private parties to obtain prejudgment attachments. We asked first whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority, ...; and second, whether the private party charged with the deprivation could be described in all fairness as a state actor, ....

Given that the statutory authorization for the challenges exercised in this case is clear, the remainder of our state-action analysis centers around the second part of the Lugar test, whether a private litigant in all fairness must be deemed a government actor in the use of peremptory challenges. Although we have recognized that this aspect of the analysis is often a factbound inquiry, ... our cases disclose certain principles of general application. Our precedents establish that, in determining whether a particular action or course of conduct is governmental in character, it is relevant to examine the following: the extent to which the actor relies on governmental assistance and benefits; whether the actor is performing a traditional governmental function;

and whether the injury caused is aggravated in a unique way by the incidents of governmental authority .... Although private use of state-sanctioned private remedies or procedures does not rise, by itself, to the level of state action, our cases have found state action when private parties make extensive use of state procedures with 'the overt, significant assistance of state officials.'" (citations omitted; emphasis added)).

7. See Andrews v. Federal Home Loan Bank of Atlanta, 998 F.2d 214, 219 (4th Cir.1993)(Wilkinson, J.):

The fourth category of state action limits the actions that a state can take in enforcing the rights of private individuals. When the state commits an unconstitutional act in the course of enforcing private rights, the private entity may be held accountable for invoking the state's authority. For example, when the state enforces a property right at the behest of a private entity, the state's actions may be limited by Due Process. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 924, 102 S.Ct. 2744, 2747, 73 L.Ed.2d 482 (1982) (state action found when "Clerk of the state court issued a writ of attachment, which was then executed by the County Sheriff" on basis of ex parte petition from creditor). By contrast, when a private party acts alone without the assistance of state agents to enforce property rights created by state law, no state action is involved. See Flagg Bros., 436 U.S. 149, 166, 98 S.Ct. 1729, 1738 (no state action where warehousemen sold goods, executing lien permitted by state law). There must be state action, not "mere acquiescence." Id. at 164, 98 S.Ct. at 1737; San Francisco Arts & Athletics, 483 U.S. at 547, 107 S.Ct. at 2985, 97 L.Ed.2d 427 (1987). See also Jackson v. Pantazes, 810 F.2d 426, 428–29 (4th Cir.1987); Hicks v. Southern Md. Health Sys. Agency, 737 F.2d 399, 402 (4th Cir.1984); Artist v. Virginia Int'l Terminals, Inc., 679 F.Supp. 587, 589 (E.D.Va.), aff'd, 857 F.2d 977 (4th Cir.1988).

representative of the Sheriff's Office present; the eviction process had been relinquished entirely to TSI.

Moreover, it cannot be disputed that the statutory regime under which TSI gained title to the property is quick with official state involvement and encouragement. Plaintiffs would go so far as to suggest that the reality of the circumstances was that Maryland was actually using TSI to "collect" overdue taxes, and thus TSI was performing a public function. Whether this line of argument should be considered under part two of the *Lugar* analysis, *see supra* 457 U.S. at 928, need not be determined for now, but it is clear that TSI's ability to obtain title to the property is inextricably bound up with an intricate statutory regime aimed at enhancing the state's ability to collect the public fisc.

Although the Supreme Court has never considered the issue under what circumstances a private landlord who procures an eviction might be found to have acted "under color of law," at least one early commentator has observed that the case law in respect to the liability under 42 U.S.C. § 1983 of private entities who procure evictions is anything but mixed:

> Nominally private parties may act with state consent, encouragement, or funding. A state may receive benefit from the "private" conduct; it may regulate the conduct; it may even compel the conduct by law. At some point, this nominally private conduct may fairly be attributed to the state and will become actionable under § 1983. *It is clear that this point may be detected only through an examination of the particular facts involved in each case.*
>
>     \*     \*     \*     \*     \*     \*

The courts have generally declined to find state action in an eviction where the only connection between the state and the landlord is the landlord's use of state legal process, although some early cases reached a contrary result .... *The reason most frequently given for this position is that the state is not normally aware of any improper motive that the landlord may have in seeking eviction, and that the state's mere acquiescence in the eviction is insufficient to create state action. See, for example, Chicarelli v. Plymouth Garden Apartments,* 551 F.Supp. 532 (E.D.Pa. 1982); *see also Flagg Bros. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). *However, the use of state process has been cited as one factor which, in conjunction with other contacts between a state and a private landlord, has led to a state action finding. See, for example, Joy v. Daniels,* 479 F.2d 1236 (4th Cir. 1973). *Furthermore, the allegation of a conspiracy with a state official in the abuse of state process, if proven, can demonstrate state action....*

Annotation, *When is eviction of tenant by private landlord conducted "under color of state law" for Purposes of 42 USCA § 1983,* 73 A.L.R. FED. 78, 82, 84 (1985) (emphases added; footnote omitted). Moreover, at least one federal district court has applied *Lugar* to deny a motion to dismiss a complaint asserting a § 1983 claim against a private landlord who acted in concert with a local law enforcement officer in effecting an eviction. *See Quinones v. Durkis,* 638 F.Supp. 856, 861 (S.D.Fla.1986). Accordingly, it is prudent to allow a full development of the historical facts surrounding TSI's involvement in the state tax sale scheme in general and its involvement in the present case as well, before determining whether to allow the § 1983 claims against it to go forward.[8]

## IV. CONCLUSION

I have concluded that defendant Brown should be dismissed from this action because

---

8. To be sure, there remains some uncertainty surrounding the application of the "under color of law" or "state action" precepts in the Fourth Circuit. The Court's most recent explication of its "state action" approach seems to collapse the independent *Lugar* "joint action" analysis into the "symbiotic relationship" test:

> A private entity *regulated* by the state acts under color of state law (1) when there is either a sufficiently close nexus, or joint action between the state and the private party; (2) when the state has, through extensive regulation, exercised coercive power over, or provided significant encouragement to, the private actor; or (3) when the function performed by the private party has traditionally been an exclusive public function.

*S.P. v. City of Takoma Park, Md.,* 134 F.3d 260, 269 (4th Cir.1998) (citations omitted; emphasis added). It is to be noted that, unlike the articulation of the "symbiotic relationship" test in *Haavistola, S.P.[v. City of Takoma Park, Md.,* 134

his involvement in the matters in suit was limited to the conduct of the tax sale auction, the notice for which, I have concluded, is constitutionally permissible. I have further concluded that it cannot be determined on the present record whether a viable claim under 42 U.S.C. § 1983 remains in the case against either the Sheriff (for declaratory relief only) or TSI (for damages for the August 16, 1996, eviction). Accordingly, I shall grant with prejudice defendant Brown's motion to dismiss. I shall deny the remaining motions without prejudice to the renewal of such motions after the close of discovery in this case.[9]

### ORDER

In accordance with the foregoing Memorandum, it is this 19th day of March, 1998, by the United States District Court for the District of Maryland, ORDERED

(1) That the motion to dismiss filed by William R. Brown, Jr. is GRANTED with prejudice, and William R. Brown, Jr. is DISMISSED FROM THIS ACTION; and it is further ORDERED

(2) That plaintiffs' motion for preliminary injunction and plaintiffs' motion for summary judgment are DENIED, and plaintiffs' motion to amend the complaint is DENIED AS MOOT; and it is further ORDERED

(3) That the cross-motion for summary judgment filed by defendant John W.

Anderson and the motion to dismiss, or in the alternative for summary judgment filed by Tax Sale Investors, Inc., are DENIED; and it is further ORDERED

(4) That the Clerk of the Court MAIL copies of this Order and the foregoing Memorandum to counsel of record.

---

F.3d 260 (4th Cir.1998)] purports to state a test applicable to private entities which are *regulated by the state*, as distinct from "private entities" *simpliciter*. In the face of the Court's earlier ·pronouncements, and in light of the Supreme Court's continuing adherence to the two-pronged *Lugar* "joint action" test, I do not believe it appropriate to conclude that the Fourth Circuit's decision in *S.P.* was intended to effect a fundamental alteration to the law in this area.

9. Defendants Brown and Anderson have been sued in their official capacities only, and only prospective injunctive and declaratory relief has been sought against them.

Plaintiffs have filed this suit as a class action, suggesting that it would be appropriate to certify two classes, namely: (1) all tenants living in Baltimore City, and (2) tenants evicted by TSI and/or tenants required to make payments to TSI in excess of those required under preexisting leases. Plaintiffs have not filed a motion to certify a class, however, and, in any event, class

action treatment hardly seems appropriate in this case.

As to the latter asserted class, it appears that individual factual determinations will predominate over class issues regarding damages. Furthermore, evidence in the record suggests that the action taken against Mr. Sallie and Ms. Marshall is not a common occurrence. Therefore, it is highly unlikely (and plaintiffs largely concede) that they can meet the requirements of FED. R. CIV. P. 23.

Moreover, as to the constitutionality of the tax sale statute, any ruling by this court would necessarily (and unavoidably) benefit (or burden) every tenant living in the state of Maryland, not simply in Baltimore City. The statute is either consistent with the Fourteenth Amendment or it is not insofar as it relies upon constructive notice to extinguish unrecorded leasehold interests, or otherwise. Class action treatment would be of little value, and would instead introduce an undesirable complication.