RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0287P (6th Cir.)
File Name: 02a0287p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

NATASHA THOMAS; SUSAN
GIBBS; and EDWINA LEWIS,
   *Plaintiffs-Appellees,*

   *v.*

ANN COHEN; GLENN CRAIG;
JAMES EMBRY; and SUSAN
FISCHER, in their individual
capacities,
   *Defendants-Appellants.*

No. 01-5088

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 99-00719—Charles R. Simpson III, District Judge.

Argued: July 31, 2001

Decided and Filed: August 23, 2002

Before: CLAY, GILMAN, and WALLACE, Circuit
Judges.[*]

―――――――――――

[*]The Honorable J. Clifford Wallace, Circuit Judge of the United
States Court of Appeals for the Ninth Circuit, sitting by designation.

1

not whether *an* officer would have concluded that plaintiffs were tenants. Rather, it is whether it would have been unreasonable for an officer in the same circumstances to act as the officers in this case did. While I applaud Officer Cushman for guessing right, he made that call under different circumstances. From Officer Cushman's deposition, it does not appear that he was told that the house was a shelter. Moreover, upon arrival, he was met by the Augusta House maintenance man, not the shelter director. And, most importantly, he was able to communicate with plaintiffs upon entering the house. Because the circumstances he confronted were entirely different, his reaction to those circumstances tells us little or nothing about whether it was reasonable for the officers in this case to tell the plaintiffs to leave Augusta House.

I would reverse the district court's denial of the officer's Motion for Summary Judgment because I believe the officers are entitled as a matter of law to qualified immunity on plaintiffs' Fourth and Fourteenth Amendment claims.

---

**COUNSEL**

**ARGUED:** Paul V. Guagliardo, CITY OF LOUISVILLE DEPARTMENT OF LAW, Louisville, Kentucky, for Appellants.    David A. Friedman, FERNANDEZ, FRIEDMAN, GROSSMAN & KOHN, Louisville, Kentucky, for Appellees. **ON BRIEF:** Paul V. Guagliardo, Gregory S. Gowen, CITY OF LOUISVILLE DEPARTMENT OF LAW, Louisville, Kentucky, for Appellants. David A. Friedman, FERNANDEZ, FRIEDMAN, GROSSMAN & KOHN, Louisville, Kentucky, for Appellees.

CLAY, J., announced the judgment of the court and delivered an opinion, in which GILMAN, J., concurred as to Part III-C. GILMAN, J. (pp. 32-34), delivered a separate opinion, in which WALLACE, J., concurred, which constitutes the opinion of the court on the issue addressed in Part III-B. WALLACE, J. (pp. 35-39), delivered a separate dissenting opinion as to Part III-C of Judge CLAY's opinion.

---

**OPINION**

---

CLAY, Circuit Judge. Defendants, Ann Cohen, Glenn Craig, James Embry and Susan Fischer, all officers with the Louisville, Kentucky, Police Department, appeal the district court's denial of their motion for summary judgment in this civil rights action filed by Plaintiffs, Natasha Thomas, Susan Gibbs, and Edwina Lewis, former residents of the Augusta House, a "transitional shelter" for women attempting to acclimate themselves to mainstream society. Plaintiffs filed suit seeking monetary damages under 42 U.S.C. § 1983 after Defendants evicted them from the Augusta House without a judicial order, allegedly in violation of Plaintiffs' Fourth and Fourteenth Amendment rights. Defendants claim that they are entitled to summary judgment under the doctrine of qualified immunity. For the reasons that follow, we

A. Exactly.   It was–like I told you, it was tumultuous.  Like I told you, everything was going everywhere.

And finally, we learn from Officer Embry that "[a]ny attempts that [he] had to discuss anything with [plaintiffs] was met with loud, foul language."

True, plaintiffs' written declarations state that Natasha Thomas told the officers the plaintiffs "paid rent and had rights." But plaintiffs never dispute that Thomas was in the midst of an uncontrollable outburst when she tried to communicate this to the officers.  Plaintiffs' own behavior, then, prevented the officers from determining the true nature of the Augusta House living arrangements.  In a footnote, Judge Clay suggests that I mistakenly view the evidence on this point in the defendants' favor. Our obligation to view the evidence in the plaintiffs' favor, however, arises only when the "defendant disputes the plaintiffs' version of the story." *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002).  As I have already said, defendants' testimony that plaintiffs' own behavior inside Augusta House prevented any communication is undisputed.   We must therefore accept defendants' testimony in this regard on its face.

Because further inquiry was made impossible, it was reasonable for the officers to rely on their initial conclusion that Augusta House was a traditional shelter and, consequently, that plaintiffs could, indeed should, be removed without pre-eviction process.  In hindsight, this may have been a mistake.  Because it was impossible to determine the exact nature of the Augusta House living arrangements, however, it was just the kind of "reasonable mistake[]" that the qualified immunity doctrine was designed to protect. *Saucier*, 533 U.S. at 205.

The lead opinion makes much of the fact that Officer Cushman concluded that he could not legally remove plaintiffs after he was dispatched to Augusta House the night before the incident here in question. Our inquiry, however, is

---

**AFFIRM** the district court's judgment inasmuch as we hold that Plaintiffs' evictions were effectuated in violation of their Fourteenth Amendment rights.   We reject Plaintiffs' arguments that the evictions violate Plaintiffs' Fourth Amendment rights, although Judge Clay would hold that Plaintiffs' Fourth Amendment rights were violated as well.

## I. BACKGROUND

The Augusta House is located in Louisville and operated by Mission House, Inc.  At all times relevant to this case, Plaintiffs were residents of the Augusta House, retained keys to the premises, and had full rights of entry.  The Augusta House charged each resident a monthly fee of $140 to live there.  Each resident of the Augusta House had her own bedroom, but shared the rest of the house in common.  In the fall of 1998, a dispute arose between Plaintiffs and the Director of the Augusta House, Laura Zinious ("Zinious"), regarding Plaintiffs' alleged violations of the Augusta House rules. Zinious, who did not live on the premises, decided to evict Plaintiffs from the residence for these alleged violations. Meanwhile, Plaintiffs met with Linda Roberts, an attorney at the local Legal Aid Society, who informed them that, in her legal opinion, they were "tenants" of the Augusta House and could not be removed unless Zinious followed Kentucky's forcible detainer (statutory eviction) procedures.[1]  Roberts wrote a letter to Zinious stating this opinion.  Plaintiffs also obtained a similar letter from the Louisville Tenants Association ("LTA"), a tenant advocacy group.  Defendants

---

[1] Under the Kentucky Uniform Residential Landlord and Tenant Act ("URLTA"), 1989 KY. REV. STAT. ("K.R.S.") §§ 383.505 - 383.705 (Banks-Baldwin), "self-help" evictions by landlords are prohibited. K.R.S.  §§ 383.615(4); 383.690.  Instead, the state provides for written notice prior to termination of a lease, K.R.S. § 383.660, and "forcible detainer" actions by a landlord upon the refusal of a tenant to deliver possession.  K.R.S. §§ 383.200; 383.615(4).

have conceded for purposes of this appeal that Plaintiffs were tenants of the Augusta House.[2]

In the early evening of Monday, December 7, 1998, an Augusta House employee called the Louisville Police regarding a dispute with Plaintiffs. Officer Larry Cushman ("Cushman") responded to the call. When Cushman arrived at the scene, he was asked to remove Plaintiffs from the residence. No court order had been obtained authorizing an eviction. Based upon information supplied to him by Plaintiffs, as well as his own independent observations, Cushman declined to remove Plaintiffs from the residence. Cushman then advised the complainant to seek redress

---

[2]The URLTA defines a "tenant" as "a person entitled under a rental agreement to occupy a dwelling to the exclusion of others." K.R.S. § 383.545(15). A "rental agreement" is defined as any agreement "written or oral, and valid rules and regulations . . . embodying the terms and conditions concerning the use and occupancy of a dwelling and premises." K.R.S. § 383.545(11).

removal. Thus, the officers had every reason to believe, at least at first, that plaintiffs had no property interest in the shelter.

A reasonable officer, though, still might have asked plaintiffs for more information about the Augusta House living arrangements. However, when the officers entered Augusta House, plaintiffs made it impossible for the officers to inquire further. Officer Cohen testified that "[a]ll three of them were yelling so loudly and cussing, it was hard to even talk to one of them." When asked if he was "able to discern what [plaintiffs] anger was about," Officer Craig responded:

[a]gain, not specifically. As I recall, they were just–all three of them were talking and yelling all at one time, not really any good, usable information from that, other than just trying to calm them down and maintain order just for safety reasons, initially.

Further, Officer Fischer's deposition reveals the following:

Q. And was that the first thing that got said to them, that they needed to get ready and leave?
A. We asked them if–how did we put that. We asked them if they lived there or stayed there or whatever the–we couldn't distinguish, you know, from one to the other because they were all yelling and screaming and carrying on. They were ticked off at her [Zinious], they were being belligerent towards her, so it was hard to keep them all calm to get any common sense out of anybody.

. . .

Q. Okay. Were there any discussions that you heard between the officers and the manager while you were at the house?
A. To be honest with you, quite frank with you, no, because it was too loud. It was hard to distinguish who was talking to who.
Q. Nobody was listening to anybody else?

officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether [his response to those facts] is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.* at 205.

With respect to the initial inquiry, I agree with the majority that plaintiffs had a constitutional right to predeprivation process–assuming, as we are for purposes of this appeal, that plaintiffs were deprived of a property interest by virtue of their status as alleged tenants. However, I part with my colleagues on whether that right was clearly established because I believe it would not have been clear to a reasonable officer, under the circumstances confronted by the officers in this case, that plaintiffs had a property interest in and therefore a right not to be prematurely evicted from Augusta House. *See Harlow*, 457 U.S. at 818 ("On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.").

Consider the circumstances. Plaintiffs were living in a transitional women's shelter or half-way house. Normally, shelter occupants in Kentucky have no property interest in the shelter and thus no right to pre-eviction process either because the occupant is not a tenant, Ky. Rev. Stat. Ann. § 383.545(15) (defining tenant), or because the shelter is exempt from Kentucky landlord-tenant law, *Id.* § 383.535. Indeed, all four officers testified that they did not believe that plaintiffs and Augusta House had a landlord-tenant relationship.

When the officers were dispatched to Augusta House, they were told that it was a shelter. When they arrived at the scene, Laura Zinious approached them and identified herself as the shelter director. She told them that the plaintiffs had violated shelter rules, that they had refused to leave, and that it was "standard practice" for the police to assist with their

through proper legal channels by filing eviction papers.[3] Officer Cushman is not a party to this action.

---

[3]In his deposition, Cushman stated his reasons for not forcing Plaintiffs to leave:

Upon arriving at the scene, I informed dispatch I was there and the individual was outside and I met him outside. He said he had, I believe, three subjects inside that needed to be evicted. I asked him if he had proper documentation, which he showed me a piece of paper, and I can't recall exactly what it looks like, or what it said at the point in time. But at the point in time I looked at it, it gave me no legal parameters to do anything, so I had him wait. I went up and knocked on the door, went inside, and talked to three females. They were upset, said that he was trying to put them out. And I can't recall exactly what they said, but I believe that they were being accused of theft, or something. And I asked them if they had been served an eviction notice, a ten-day notice, or anything like that, and I believe they informed me at that point in time they had not. And, basically, I didn't see any illegal doings going on in my presence. I felt there was not much I could do. I gave them some basic information, that if they felt that they were being falsely accused or put out, that they should call the Louisville Landlord/Tenants Association. And I went back outside, and I told the individual out there that I had no legal – I felt at that point in time I had no legal right to put them out on the street and refused to do so.

. . .

I didn't have any legal papers in front of me signed by a judge, no eviction papers signed by, you know, the courts or the system downtown. It looked like a residence to me. The room I was standing in looked like a living room. There was furniture there . . . . I didn't see any sign of disorderly conduct. They weren't looking like they were going to hurt themselves or anybody else. Looked like they had established residency. I asked them if they had all their personal belongings there, had all their clothing and personal effects and everything. They were telling me that they were living there. And I felt that there was nothing under the law at that point in time that I could do to either arrest them or put them out on the street.

(J.A. at 267-270.)

The following morning, Zinious called the police to have Plaintiffs removed.  This time, the Defendant officers responded to the call.  They had no knowledge of Officer Cushman's prior interaction with Plaintiffs.  When the officers arrived at the residence, Zinious told them that Plaintiffs had violated the rules of the shelter by possessing alcohol and illegal drugs on the premises.  She also told them that Plaintiffs threatened other Augusta House residents and that they refused to leave despite her orders to do so.  Zinious then told the officers that eviction was "standard procedure" under the circumstances and asked them to remove Plaintiffs from the residence.  She never produced a court order or other documentation authorizing the eviction.

Plaintiffs claim that the officers then entered their rooms and announced that they would have to leave the premises immediately.  Plaintiffs informed the officers that they paid monthly rent to the Augusta House and showed or offered to show them the letter from the LTA.  The officers disregarded Plaintiffs' attempts to provide explanations and documentation supporting their legal right to reside at the premises and proceeded to evict them without the benefit of a court order.  At some point, one Plaintiff attempted to call attorney Roberts to tell her that the police were evicting Plaintiffs, but an officer ordered her to leave, laughed at her, and told her that she was homeless and did not have a lawyer.  There was no physical confrontation during the eviction, and none of Plaintiffs' personal property was destroyed.  However, Plaintiffs were not able to retrieve all of their belongings prior to the eviction.  The officers do not claim that an emergency or exigent circumstances existed at the time to justify the eviction.

Plaintiffs subsequently filed suit against the officers, seeking monetary damages against them in their individual capacities under 42 U.S.C. § 1983 for violating Plaintiffs' Fourth Amendment right to be free from unreasonable seizures and their Fourteenth Amendment right not to be deprived of possessory interests in property without due

---

## CONCURRING IN PART, DISSENTING IN PART

---

WALLACE, Circuit Judge.  I concur with Judge Gilman that the officers are entitled to qualified immunity on the Fourth Amendment claim because any Fourth Amendment right not to be evicted, if there is one, has not been demonstrated to be a seizure and has not yet been clearly established.  I dissent, however, from the majority's conclusion that there is a genuine issue of material fact as to whether the officers are entitled to qualified immunity on the Fourteenth Amendment Due Process claim.  I would reverse.

The qualified immunity doctrine has been described in the following terms: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether the officers in this case are entitled to this immunity, we first ask whether "the facts alleged show the officer's conduct violated a constitutional right[.]"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If we determine that a constitutional right has been violated, we then "ask whether the right was clearly established."  *Id.*  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* (citation and quotation marks omitted).

Further,

[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the

would not have known that the eviction in question violated the plaintiffs' Fourth Amendment right to be free from the unreasonable seizure of their real estate interest. I would therefore affirm the district court's decision to deny qualified immunity on the plaintiffs' due process claim, but would reverse the district court's determination that the plaintiffs are entitled to proceed to trial on their seizure-of-property claim.

process.[4] Defendants filed a motion for summary judgment invoking the doctrine of qualified immunity. The district court denied this motion, and Defendants filed a timely appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

Before turning to the merits of the case, we must first address Plaintiffs' contention that this appeal should be dismissed because we lack jurisdiction to review the district court's denial of summary judgment. Defendants' appeal focuses solely on the district court's determination that they are not entitled to qualified immunity. Generally, denials of summary judgment on the basis of qualified immunity are "collateral orders" that are immediately appealable to the extent that they present issues of law separable from the merits yet potentially determinative of a claim. *Mattox v. City of Forest Park*, 183 F.3d 515, 519 (6th Cir. 1999); *Berryman v. Reiger*, 150 F.3d 561, 562 (6th Cir. 1998). The Supreme Court has explained that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Thus, while we "cannot review on interlocutory appeal a district court's determination that a genuine issue of fact exists for trial, . . . we retain jurisdiction over the legal question of qualified immunity, i.e., whether a given set of facts violates clearly established law." *Mattox*, 183 F.3d at 519 (citations omitted). As a purely legal determination, the district court's denial of qualified immunity is subject to *de novo* review. *Id.*[5]

---

[4] Plaintiffs also filed suit against Mission House, Inc., seeking a temporary injunction and restraining order under the Kentucky Landlord-Tenant Act. This action was later dismissed after the parties settled the case on December 11, 1998.

[5] In reviewing whether Defendants are entitled to qualified immunity, we take the facts in the light most favorable to Plaintiffs. *See Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002). In determining that Defendants

### III. ANALYSIS

To state a claim under 42 U.S.C. § 1983, a plaintiff must prove that the defendant, while acting under color of state law, deprived her of a right secured by the Constitution or laws of the United States. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). "[A] government official's discretionary abuse of power which goes beyond the scope of his or her authority will usually have been performed under color of state law for purposes of section 1983 liability." *Cassady v. Tackett*, 938 F.2d 693, 700 (6th Cir. 1991) (Engle, J., concurring in part and dissenting in part).

**A.  The Doctrine of Qualified Immunity**

The doctrine of qualified immunity generally shields state actors from liability under § 1983 based on their discretionary acts. *Anderson v. Creighton,* 483 U.S. 635, 638-640 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Daugherty v. Campbell*, 935 F.2d 780, 783-84 (6th Cir. 1991). As noted by this Court in *Daugherty*, "[q]ualified immunity entitles its possessor to '*immunity from suit* rather than a mere defense to liability.'" *Id*. at 783 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). Thus, government actors, including police officers, have the freedom to perform their official duties without fear that even a slight misstep will trigger their financial ruin. *Wyatt v. Cole*, 504 U.S. 158, 167 (1992). However, government actors may lose this immunity when they violate clearly established constitutional rights of which a reasonable person should have known. *Anderson,* 483 U.S. at 638-39; *Harlow*, 457 U.S. at 818. "[W]hether an official protected by qualified immunity may be held

_____

are entitled to qualified immunity on Plaintiffs' Fourth and Fourteenth Amendment claims, Judge Wallace in his dissenting opinion inappropriately construes the facts in the light most favorable to Defendants.  Contrary to the assertion in Judge Wallace's opinion that Plaintiffs did not dispute Defendants' testimony that Plaintiffs' behavior inside Augusta House prevented any communication, the deposition testimony in the record clearly indicates that Plaintiffs disputed Defendants' version of the events in question.

plaintiffs from the shelter, the officers did not take physical possession of the property.  The officers in fact did nothing more than escort the plaintiffs from their place of residence. I can find no published opinion anywhere holding that an eviction under these circumstances is a seizure of property for the purpose of the Fourth Amendment.

In concluding that the eviction in this case was a seizure of property, the lead opinion relies upon *United States v. Jacobsen*, 466 U.S. 109 (1984), and *Soldal v. Cook County*, 506 U.S. 56 (1992).  Both of these cases, however, involved conduct that included the taking of physical control over the property in question.  The government actors in *Jacobsen* seized property when they took "dominion and control" over a package and destroyed its contents in a field narcotics test. 466 U.S. at 120, 125.  Likewise, the seizure of property in *Soldal* occurred when the government actors helped conduct an eviction by physically removing a mobile home from its foundation.  506 U.S. at 72.

Although a government official may be held liable for violating a clearly established right even if that right has not been explicitly recognized, precedent must exist that makes the unlawfulness of the official's conduct "apparent." *Risbridger*, 275 F.3d at 569.  But I am hard-pressed to conclude that the eviction in this case was a seizure of property at all, much less that precedent made it clear to the officers that their conduct in fact constituted such a seizure. The term "seizure," in my view,  connotes a physical act of control or possession over the item seized, and both the Supreme Court and this court have consistently construed the term within the bounds of its plain meaning. *E.g.*, *Soldal*, 506 U.S. at 72; *Flatford v. City of Monroe*, 17 F.3d 162, 169-70 (6th Cir. 1994) (concluding that a seizure of property occurred where government actors evicted the plaintiffs in the course of condemning their apartment building).

In any event, I do not believe that we need to decide whether a seizure actually took place in this case, because, at the very least, a reasonable person in the officers' position

---

## CONCURRING IN PART, DISSENTING IN PART

---

RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part. I concur in the lead opinion's determination that, at least at the summary judgment stage, the police officers in the present case are not entitled to qualified immunity with regard to the plaintiffs' due process claim under the Fourteenth Amendment. But I disagree with the lead opinion's conclusion that the officers are not entitled to qualified immunity on the plaintiffs' seizure-of-property claim under the Fourth Amendment. I therefore respectfully dissent from that portion of the lead opinion.

The plaintiffs allege that their real estate interest was unreasonably seized when the officers evicted them from the shelter in which they were living. Even assuming that an unreasonable seizure occurred, the officers are entitled to qualified immunity so long as they did not violate clearly established constitutional or federal statutory rights in conducting the eviction. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is "clearly established" only where the contours of that right are so clear "that a reasonable official would understand that what he is doing violates that right." *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002). To determine if a right is clearly established, this court "look[s] first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Key v. Grayson*, 179 F.3d 996, 999-1000 (6th Cir. 1999).

The constitutional right to be free from the unreasonable seizure of property is clearly established. U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."). Whether the eviction that occurred in the present case constitutes a seizure of property, however, is anything but clear. In evicting the

---

personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action." *Anderson*, 483 U.S. at 639 (quoting *Harlow*, 457 U.S. at 819).

Plaintiffs bear the burden of defeating this immunity, which is a legal issue to be decided by the court. *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999). First, Plaintiffs must show that Defendants deprived them of a right protected by the Constitution. Second, this right must be so clearly established that a reasonable officer would understand that his or her actions would violate that right. *Harlow*, 457 U.S. at 818-19; *Cooper v. Parrish*, 203 F.3d 937, 951 (6th Cir. 2000). As stated by the Supreme Court in *Anderson*:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 640 (citation omitted); *see also Daugherty*, 935 F.2d at 784.

In the instant case, the district court determined that Defendants violated two of Plaintiffs' explicit constitutional rights: their Fourth Amendment right to be free from unreasonable seizures and their Fourteenth Amendment right to be afforded due process of law. On appeal, Defendants claim that they were entitled to qualified immunity because their involvement in a "garden-variety" landlord-tenant dispute cannot constitute a violation of the Fourth Amendment. Defendants further contend that inasmuch as they were not authorized to conduct a predeprivation hearing under Kentucky law, and because adequate postdeprivation remedies were in place, their actions cannot amount to a violation of the Fourteenth Amendment's Due Process Clause. Finally, Defendants claim that even if Plaintiffs' constitutional rights were violated, those rights were not so

clearly established that reasonable officers would have known that they were violating them.

## B.  Deprivation of Fourth Amendment Rights

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, provides in pertinent part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. This right applies with equal force in both the civil and criminal contexts. *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 539 (1967).  In *United States v. Jacobsen*, 466 U.S. 109, 113 (1984), the Supreme Court explained that the first clause of the Fourth Amendment "protects two types of expectations, one involving searches, the other seizures." According to *Jacobsen*, a search occurs when an expectation of privacy that society is prepared to consider is infringed, whereas a seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *Id*.  In *Jacobsen,* the Court further explained: "While the concept of a 'seizure' of property is not much discussed in our cases, this definition follows from our oft-repeated definition of the 'seizure' of a person within the meaning of the Fourth Amendment -- meaningful interference, however brief, with an individual's freedom of movement." *Id.* at 114 n 5.  This expansive definition is necessary because a seizure threatens an individual's distinct interest in retaining possession of his or her property. *See Texas v. Brown*, 460 U.S. 730, 747-48 (1983) (Stevens, J., concurring).

### 1. *Soldal v. Cook County , Illinois*, 506 U.S. 56 (1992)

The Supreme Court has also recognized that the participation of a police officer in an improper eviction constitutes a seizure in violation of the Fourth Amendment. The controlling case in this regard is *Soldal v. Cook County, Illinois*, 506 U.S. 56 (1992), where the Supreme Court, reversing an *en banc* opinion written by Judge Posner of the Seventh Circuit, addressed whether mobile home owners had

constituted a violation of their clearly established Fourteenth Amendment rights.  In addition, we find that the officers had no reasonable basis to believe that the eviction was justified in the absence of exigent circumstances.  Accordingly, Defendants are not entitled to qualified immunity and the district court's decision is **AFFIRMED** with respect to the Fourteenth Amendment claims.  Defendants are entitled to qualified immunity as to Plaintiffs' Fourth Amendment claims, and as to those claims the district court is **REVERSED**.

eviction notice. It is clear that the officers never undertook to determine whether Plaintiffs were in fact tenants. They merely claim that it was objectively reasonable for them to rely upon Zinious' representations to the contrary and that they were not required to believe Plaintiffs' story. While Officer Cushman's previous interaction with Plaintiffs is not dispositive, we find it relevant that Cushman realized only the evening before the eviction that he had no legal basis for forcing Plaintiffs out onto the street. Under these circumstances, we find that this case presents more than mere mistaken judgment, but rather an unwarranted failure to make the determinations necessary prior to taking hasty action. Thus, we are unable to rationalize the officers' failure to ensure any form of process prior to evicting Plaintiffs.

For the same reasons, I believe that Defendants are not entitled to qualified immunity on the Fourth Amendment claim. As we indicated in *Flatford*, "the Fourth Amendment standard of reasonableness requires no more of government officials than that of due process of law. Both constitutional provisions recognize an exigency exception, and, thus, lead to no practical distinction in this case." *Flatford*, 17 F.3d at 170 (citations and internal quotation marks omitted). Furthermore, *Soldal* was a unanimous Supreme Court decision decided well before the incidents giving rise to Plaintiffs' complaint occurred. In addition, *Soldal* merely refined well-settled rules of law. Thus, it was clear in this Circuit at the time of the eviction that Plaintiffs had a right not to have their possessory interests in property encumbered by the type of unreasonable seizure that occurred in this case. Objectively reasonable officers in the same circumstances would have known that they were violating Plaintiffs' Fourth Amendment rights. I therefore conclude that Defendants are not entitled to qualified immunity with respect to Plaintiffs' unreasonable seizure claim.

## IV. CONCLUSION

Based upon Supreme Court and Sixth Circuit precedent, we hold that Plaintiffs' eviction from the Augusta House

their mobile home seized within the meaning of the Fourth Amendment when deputy sheriffs assisted the owner and manager of the trailer park in physically tearing the mobile home from its foundation and towing it to another lot. As the Court noted in *Soldal*, the Seventh Circuit, while acknowledging that there was a "'seizure' in the literal sense," found no Fourth Amendment violation "because it was not made in the course of public law enforcement and because it did not invade the Soldals' privacy." *Id*. at 60. In *Soldal*, the U.S. Supreme Court remarked on the reasoning of the Seventh Circuit as follows:

This conclusion followed from a narrow reading of the Amendment, which the court construed to safeguard only privacy and liberty interests while leaving unprotected possessory interests where neither privacy nor liberty was at stake. Otherwise, the court said,

"a constitutional provision enacted two centuries ago [would] make every repossession and eviction with police assistance actionable under -- of all things - the Fourth Amendment[, which] would trivialize the amendment and gratuitously shift a large body of routine commercial litigation from the state courts to the federal courts. That trivializing, this shift, can be prevented by recognizing the difference between possessory and privacy interests."

Because the officers had not entered Soldal's house, rummaged through his possessions, or, in the Court of Appeals' view, interfered with his liberty in the course of the eviction, the Fourth Amendment offered no protection against the "grave deprivation" of property that had occurred.

*Soldal*, 506 U.S. at 60 (citations omitted).

In rejecting the Seventh Circuit's interpretation of the Fourth Amendment, the Supreme Court held that "the Amendment protects property as well as privacy." *Id*.

Responding to the argument that, after *Katz v. United States*, 389 U.S. 347 (1967), *Warden v. Hayden*, 387 U.S. 294 (1967) and *Cardwell v. Lewis*, 417 U.S. 583 (1974), "the Fourth Amendment is only marginally concerned with property rights," the Court stated that "the message of those cases is that property rights are not the sole measure of Fourth Amendment violations." *Soldal,* 506 U.S. at 64.[6] Moreover, the Court rejected the claim that "any of the Court's prior cases supports the view that the Fourth Amendment protects against unreasonable seizures of property only where privacy or liberty is also implicated." *Id*. at 65. The Court also rejected the view that the Fourth Amendment protects only against seizures that are the outcome of a search, holding that "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Id.* at 68. Putting forth a rather expansive interpretation of the Fourth Amendment, the Court in *Soldal* declared that its purpose was to protect the people from governmental interference:

> In our view, the reason why an officer might enter a house or effectuate a seizure is wholly irrelevant to the threshold question whether the Amendment applies. *What matters is the intrusion on the people's security from governmental interference. Therefore, the right against unreasonable seizures would be no less*

---

[6] As various commentators have pointed out, early in the last century, the Supreme Court, relying upon Lord Camden's opinion in the 1765 case of *Entick v. Carrington*, 19 Howell's State Trials 1029, 95 Eng. Rep. 807 (C.P. 1765) (finding invalid the seizure of private papers pursuant to a general warrant), analyzed Fourth Amendment cases through the prism of property rights, culminating in the case of *Olmstead v. United States*, 277 U.S. 438 (1928), which held that the Fourth Amendment does not protect a homeowner against wiretaps of phone conversations provided that there was no trespass of the homeowner's property. *Hayden* and *Katz* changed course, holding that privacy, not property, was the organizing principle of Fourth Amendment analysis. Thus, *Soldal* must be understood against this backdrop of the Court's Fourth Amendment jurisprudence during the last century.

that [Plaintiffs] were entitled to pre-eviction judicial oversight in the absence of emergency circumstances." *Flatford*, 17 F.3d at 170. Furthermore, Kentucky laws forbidding self-help evictions without judicial process and providing for preeviction notice and forcible detainer actions were well-established. As trained police officers, Defendants should have known that self-help evictions are prohibited in the state of Kentucky, and that the eviction they facilitated was therefore "patently unlawful." *Cofield v. Randolph County Comm'n*, 90 F.3d 468, 471 (11th Cir. 1996); *cf. Havertisck*, 32 F.3d at 995 (distinguishing between officers engaged in passive peace-keeping conduct during a lawful eviction and activity designed to facilitate an unlawful interference with possessory interests).

Defendants claim that they were not attempting to deprive Plaintiffs of their property rights and indeed did not believe that Plaintiffs had any such rights because it was unclear at the time whether Plaintiffs were "shelter residents" or "tenants".[12] Defendants admit that had they known Plaintiffs were tenants of the Augusta House, they would not have evicted them. But they argue that they are entitled to qualified immunity if they mistakenly, but reasonably, concluded that Plaintiffs were not tenants even though they now admit in hindsight that Plaintiffs were indeed tenants. The qualified immunity doctrine generally encompasses judgmental errors. However, Defendants had an opportunity to resolve this question prior to evicting Plaintiffs, but they failed to do so. The officers concede that Plaintiffs told them that they paid rent, were protected by landlord-tenant law, and claimed an entitlement to remain at the residence absent an

---

[12] Certain living arrangements are excluded from coverage under the Kentucky URLTA, including: "[r]esidence at an institution, public or private, if incidental to detention or the provision of medical, geriatric, educational counseling, religious, or similar service." K.R.S. § 383.535. Defendants briefly claim in their reply brief that Plaintiffs' living arrangements at Augusta House could fall within this exclusion due to the financial and religious counseling services provided by Mission House, Inc. staff. However, Defendants have conceded for purposes of this appeal that Plaintiffs are tenants under Kentucky law.

provide notice having a substantial degree of effectiveness at a meaningful time prior to eviction." *Sallie*, 998 F. Supp. at 620.

### D. Qualified Immunity

We must also decide whether, in light of clearly established law applicable on the date of the eviction, a reasonable officer would have believed that Defendants' conduct deprived Plaintiffs of their Fourth and Fourteenth Amendment rights. "When conducting an inquiry to determine whether a constitutional right is clearly established, the law of our [C]ircuit requires us to look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our [C]ircuit, and finally to decisions of other circuits." *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991) (citations and quotation marks omitted). The standard for qualified immunity "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified . . . ." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)) (quotation marks omitted). Thus, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo*, 953 F.3d at 1042. Although it need not be the case that "the very action in question has previously been held unlawful . . . in the light of pre-existing law the unlawfulness must be apparent." *Id.* Immunity applies if reasonable officials could disagree as to whether the conduct violated the plaintiff's rights. *McCloud v. Testa*, 97 F.3d 1536, 1553 (6th Cir. 1996). However, the doctrine offers no protection to "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

We do not believe that Defendants are entitled to qualified immunity with respect to Plaintiffs' procedural due process claim. The Supreme Court had decided *Fuentes* and *Good Real Prop.* long before Plaintiff's eviction. As we stated in *Flatford*, "it was sufficiently clear at the time of the eviction

---

*transgressed if the seizure of the house was undertaken to . . . effect an eviction by the police . . . .*

*Id.* at 69 (emphasis added).

Applying this broad interpretation of the Fourth Amendment, the Court found that the action that "dispossessed the Soldals of their trailer home by physically tearing it from its foundation and towing it to another lot" implicated the interests of the Fourth Amendment. In reaching this conclusion, the Court rejected the Seventh Circuit's view that because "the Soldals' claim was more akin to a challenge against the deprivation of property without due process of law than against an unreasonable seizure . . . they should not be allowed to bring their suit under the guise of the Fourth Amendment." *Id.* at 70. Rather, the Court, citing *Hudson v. Palmer*, 468 U.S. 517 (1984), found "no basis for doling out constitutional protections in such fashion" and that "[c]ertain wrongs affect more than a single right and accordingly, can implicate more than one of the Constitution's commands." *Soldal*, 506 U.S. at 70.[7] The Court also found exaggerated the concern that its expanded interpretation of the Fourth Amendment would federalize "areas of law traditionally the concern of the States." *Id.* at 71. Noting that "'reasonableness is still the ultimate standard' under the Fourth Amendment," the Court observed that "had the ejection in this case properly awaited the state court's judgment it is quite unlikely that the federal court would have been bothered with a § 1983 action alleging a Fourth Amendment violation." *Id.* Accordingly, the Court believed that "reaffirmance of Fourth Amendment principles should not foment a wave of new litigation in the federal courts." *Id.* at 72.

---

[7]About one year after *Soldal*, this point was developed by the Court in *United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993), where it held that before the seizure of real property the homeowner was entitled to notice and an opportunity to be heard under the Due Process Clause.

## 2.   Plaintiffs were deprived of clearly established rights under the Fourth Amendment

The question before us is whether the Supreme Court in *Jacobsen* and *Soldal* clearly established that a "seizure" of property within the meaning of the Fourth Amendment occurs when governmental agents enforce an illegal eviction by forcing a tenant to vacate his or her residence, but otherwise do not assist in physically taking over or moving the premises? When a governmental agent carries out an eviction without a court order and in the absence of any colorable legal authority, this question must be answered affirmatively. As the Court stated in *Jacobsen*, there is "some meaningful interference" with a tenant's possessory interest in his or her property, "however brief," when a governmental agent removes a tenant from his or her residence, whether a home or apartment. *Soldal* reiterated this point. Simply put, *Soldal* does not require that the "meaningful interference" by governmental agents actually involve the physical seizure of the property in question; rather, to constitute a seizure of property within the meaning of the Fourth Amendment, it is enough that the governmental agent's action amounted to "meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113. Escorting tenants from their residences in the course of effectuating an eviction, as in this case, satisfies the requirement of "meaningful interference" with their leasehold interest so as to amount to a seizure of their property. In this regard, the lack of physical force is not terribly germane inasmuch as the police effectuated the eviction by the very apparent and not too subtle threat of physical force and dire legal consequences should the tenants not comply with the officers' instructions to vacate the property. Under the facts of this case, Plaintiffs therefore had a clearly established right to be free from such unconstitutional seizures. *Haverstick Enters., Inc. v. Fin. Credit, Inc.*, 32 F.3d 989, 994 (6th Cir. 1994).

Defendants attempt to distinguish the instant case from *Soldal* by arguing that they only helped to resolve a "garden-

determined in that case that "postdeprivation state tort remedies are neither timely nor sufficiently remedial for emergency evacuees" because "[f]undamental fairness expects more than mere tort remedies where [the] government dispossesses its citizens from their homes." *Id.* at 169. It would therefore stand to reason that state tort remedies are likewise insufficient in situations where, as here, there is no emergency.

To be sure, in *Flatford* we did not require predeprivation process; rather we held that the state was required to provide an immediate and meaningful postdeprivation administrative process, including notice of the right to an administrative hearing and direction as to the procedure for administrative review. However, we reached this result only because the existence of exigent circumstances made predeprivation process impractical. Our holding was based upon the rationale that "*emergency* evacuations . . . are not so rare that city officials cannot prepare for advising emergency evacuees of their right to an administrative hearing as similarly provided to landlords." *Id*. at 168 (emphasis added). Conversely, in the instant case no exigent circumstances were present. Furthermore, Kentucky law provides for judicial predeprivation process prior to evictions. Therefore, the instant case is factually distinguishable from situations such as those in *Parratt* in which the deprivation is unpredictable and predeprivation process is impractical.

The Supreme Court has recognized that the "right to maintain control over [one's] home, and to be free from governmental interference, is a private interest of historic and continuing importance." *Good Real Prop.*, 510 U.S. at 44. The government's interest in enforcing a landlord's unauthorized directives pales in comparison to the importance of Plaintiffs' interest in maintaining possessory rights to their place of residence. Therefore, postdeprivation remedies of any sort would be inadequate. Instead, we believe that "given the magnitude of the indignity and the loss of personalty attendant to an eviction without notice, it is indisputable that [P]laintiffs are entitled to insist upon a genuine effort to

process claim and the court of appeals affirmed, holding that because the state provided adequate postdeprivation remedies for wrongful eviction, no due process violation had occurred. *Reese*, 865 F.2d at 187.

On appeal, Defendants rely upon *Reese* for the proposition that a § 1983 action may not lie under a procedural due process theory. Needless to say, we are not bound by a decision from another circuit. *See In re Ann Arbor R.R. Co.*, 623 F.2d 480, 482 (6th Cir. 1980). In addition, subsequent cases lead us to a different conclusion than the one Defendants advocate. First, *Reese* was decided prior to *Soldal*, *Good Real Prop.* and *Flatford*. Its continuing relevance is therefore doubtful. Furthermore, in deciding *Reese*, the Eighth Circuit relied upon an outdated interpretation of the Supreme Court's decision in *Parratt v. Taylor*, 451 U.S. 527 (1981). In *Parratt*, a prisoner sued a state employee who negligently lost materials the prisoner had ordered by mail. Although finding that the prisoner had suffered a deprivation of property interests within the meaning of the Fourteenth Amendment, the Supreme Court held that all the process due for such "random" and "unauthorized" conduct was provided under state tort law. In *Reese*, the Eighth Circuit held that an extrajudicial police eviction was the type of random conduct at issue in *Parratt*. However, this reading of *Parratt* has since been called into question. In *Zinermon v. Burch*, 494 U.S. 113, 136 (1990), the Supreme Court declined to extend the "random" and "unauthorized" conduct standard to situations where a deprivation of rights is predictable. Instead, the Court recognized that *Parratt* presented "a special case . . . in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide."

Based upon the reasoning in *Zinermon*, we recognized in *Flatford* that a citizen has no cause of action under § 1983 for due process violations "where state tort law furnishes all appropriate process, or where the deprivation cannot be predicted." *Flatford*, 17 F.3d at 168. However, we

variety" landlord-tenant dispute, which would not constitute a seizure. However, Defendants have cited out of context the following language in the conclusion to Justice White's opinion in *Soldal*:

> The complaint here alleges that respondents, acting under color of state law, dispossessed the Soldals of their trailer home by physically tearing it from its foundation and towing it to another lot. Taking these allegations as true, this was no "garden-variety" landlord-tenant or commercial dispute. The facts alleged suffice to constitute a "seizure" within the meaning of the Fourth Amendment, for they plainly implicate the interests protected by that provision.

560 U.S. at 72. This closing passage is merely intended to highlight the egregious violation in that case; it does not stand for the proposition that an act must embody physical displacement of property in order to constitute a seizure within the meaning of the Fourth Amendment. As we have previously recognized,

> [w]hile the [*Soldal*] Court was not creating new substantive Fourth Amendment law, it stated in no uncertain terms that the right against unreasonable seizures is "transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, *effect an eviction by the police*, or on a whim, for no reason at all."

*Flatford v. City of Monroe*, 17 F.3d 162, 170 n.8 (6th Cir. 1994) (emphasis added) (quoting *Soldal*, 560 U.S. at 69). Thus, it is apparent that the Supreme Court foresaw a spectrum of potential deprivations of possessory interests in property.

Moreover, the method of interference need not be factually on all fours with *Soldal* in order for a seizure to have

occurred.[8]   As the *Anderson* Court made clear, it is not necessary that "the very action in question has been previously held unlawful." 483 U.S. at 640. Rather, what is required is only that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*.

Forcible eviction of tenants, even if in a more peaceful or traditional manner than in *Soldal*, is by its very nature a meaningful interference with their possessory interests and is therefore no less a deprivation of their constitutional rights when carried out by law enforcement officers in the absence of a legal basis for doing so. The *Soldal* Court emphasized that "'at the very core' of the Fourth Amendment 'stands the right of a [person] to retreat into [her] own home,'" *id.* at 61 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)), thereby giving us every reason to regard the deprivation of Plaintiffs' possessory interests in their residence as a violation of the Fourth Amendment. To hold otherwise in the context now presented would constitute a departure from precedent. Indeed, we have previously found that mere damage to property inside a home may constitute a meaningful interference with possessory rights. *See, e.g., Bonds v. Cox*, 20 F.3d 697, 701-02 (6th Cir. 1994) (holding that, under *Soldal*, damage to a house, including broken doors, mutilated vinyl siding, broken desks, and holes in walls, rises to the level of "meaningful interference" with one's possessory interests).

---

[8]It should be noted that this analysis is not in tension with our decision in *Fox v. Van Oosterum*, 176 F.3d 342, 351 (6th Cir. 1999), in which we noted that "[t]he Supreme Court has only applied the 'meaningful interference with possessory interests' definition of seizure to cases where there is no debate that the challenged act is one of taking property away from an individual . . . ." In that case, a plaintiff alleged a Fourth Amendment violation due to police officers' unwarranted retention of his driver's license after an initially lawful seizure. Unlike the confiscation of the license in *Fox*, the eviction in the case at bar was never sanctioned under the law.

Defendants' Br. at 18. However, *Pyles* is totally inapposite. In that case we held that an arrestee could not recover under § 1983 for an arrest which violated Kentucky law, but which was supported by probable cause, because such an arrest did not implicate any federal constitutional right. But, inasmuch as an interference with Plaintiffs' state-recognized leasehold property interests constitutes a violation of their rights to procedural due process and freedom from unreasonable seizures, a federal constitutional right is clearly implicated in the instant case.[11]

### 3. Postdeprivation remedies are inadequate

Defendants further contend that the existence of postdeprivation remedies for eviction under Kentucky law satisfies the requirements of due process and a lack of predeprivation process is therefore not violative of the Fourteenth Amendment. In support of this argument, Defendants point to the Eighth Circuit's decision in *Reese v. Kennedy*, 865 F.2d 186 (8th Cir. 1989). In *Reese*, an unmarried couple shared a home for two years. The couple shared bills, but the deed to the house was in the male defendant's name, and he made the mortgage payments. At some point, Reese, his female companion, agreed to move out as soon as she was financially able. But before she could do so, the defendant, who was out of town at the time, called police officers to remove her from the home. Two officers spoke to the couple's neighbors and then asked Reese to leave. The officers prevented her from retrieving any of her belongings. Reese filed a § 1983 action against the officers and others. The district court rejected Reese's procedural due

---

[11]Essentially, Defendants are recycling the argument that they are legally incapable of violating the URLTA because the statute's purpose is to govern the rights and responsibilities of landlords and tenants, not third parties. K.R.S. § 383.505. However, as the district court aptly noted, Plaintiffs have not alleged that the officers themselves violated the URLTA; rather, Plaintiffs merely point to the URLTA as evidence of the process which was due prior to eviction. Even if Defendants did not violate URLTA, their actions may have still violated the Fourteenth Amendment.

they contend that only Plaintiffs' rights against an unreasonable seizure are implicated. We find no merit to this argument.

The Supreme Court has rejected the notion that the applicability of one constitutional amendment preempts the guarantees of another. *Good Real Prop.*, 510 U.S. at 49. In *Soldal*, the Supreme Court recognized that "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Where such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character. Rather, we examine each constitutional provision in turn." *Soldal*, 506 U.S. at 70; *Bonds*, 20 F.3d at 702.

As both the district court and Plaintiffs correctly note, Defendants seem to misconstrue the distinction between procedural and substantive due process analyses. While procedural due process ensures that citizens have procedural safeguards prior to deprivation of rights, substantive due process limits the impingement of certain fundamental rights regardless of process. *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000). Courts generally favor analyses of allegedly unconstitutional governmental acts under a specific textual right rather than under the amorphous substantive due process standard. *Graham v. Connor*, 490 U.S. 386 (1989); *accord Thaddeus-X v. Blatter*, 175 F. 3d 378, 388 (6th Cir. 1999). However, because the seizure in the case at bar implicates two explicit textual sources of constitutional protection, the Fourth and Fourteenth Amendments, "the proper question is not which Amendment controls but whether either Amendment [has been] violated." *Good Real Prop.*, 510 U.S. at 50.

Defendants do not dispute that Plaintiffs, presumed to be tenants, have rights recognized by state law. Yet, they claim that under this Court's opinion in *Pyles v. Raisor*, 60 F.3d 1211 (6th Cir. 1995), "a violation of a right conferred by state law, which is not grounded in the federal constitution, does not, by itself, state a claim under 42 U.S.C. § 1983."

Finally, the seizure of Plaintiffs' possessory interest in their residence implicates the interests of privacy, security and liberty underlying the Fourth Amendment. *See* Thomas K. Clancy, *What Does The Fourth Amendment Protect: Property, Privacy, or Security,* 33 Wake Forest L. Rev 307 (1998); Morgan Cloud, *The Fourth Amendment During the Lochner Era: Privacy, Property and Liberty in Constitutional Theory*, 48 Stan. L. Rev. 555 (1996); William C. Heffernan, *Property, Privacy, and The Fourth Amendment,* 60 Brook. L. Rev. 633 (1994). First, a tenant has a privacy interest at stake in his or her leasehold. As the Court has stated, the legitimation of expectations of privacy must have a source outside the Fourth Amendment, either by reference to concepts of real or personal property or to understandings that are recognized and permitted by society. *Rakas v. Illinois,* 439 U.S. 128 (1978). Because the right to exclude others is one of the main rights attaching to property, tenants in lawful possession of a home or apartment generally have a legitimate expectation of privacy by virtue of having a property interest in a specific piece of real estate.[9] Further, tenants, like all people, enjoy the Fourth Amendment "right . . . to be secure in their . . . houses." The personal security of tenants is thus threatened when they cannot control their possessions free from unreasonable governmental inference, whether or not these possessions are characterized as real or personal property. Finally, the liberty interest of tenants in controlling their possessions and in being left alone in their own homes would be severely compromised if people were not free from unreasonable governmental interference.

---

[9] As pointed out by the Supreme Court in *Oliver v. United States*, 466 U.S. 170, 178 (1984), quoting from *Payton v. New York*, 445 U.S. 573, 601 (1980): "The Amendment reflects the recognition of the Framers that certain enclaves should be free from arbitrary government interference. For example, the Court since the enactment of the Fourth Amendment has stressed 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.'" 466 U.S. at 178.

Therefore, assuming that Plaintiffs in the instant case were residents of the Augusta House, it is clear that their possessory interests in their place of residence were meaningfully interfered with when the officers deprived Plaintiffs of their place of residence, thus effectuating a seizure within the meaning of the Fourth Amendment.

### 3. The seizure was objectively unreasonable

However, this finding does not end our inquiry. In order to be actionable, a seizure must also be objectively unreasonable. *See Soldal*, 506 U.S. at 71 (noting that "'reasonableness is still the ultimate standard' under the Fourth Amendment") (quoting *Camara*, 387 U.S. at 539). A determination of reasonableness requires a "careful balancing of governmental and private interests." *Soldal*, 506 U.S. at 71 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985)). Under this standard, most eviction-type seizures will not be found unconstitutional. *Soldal*, 506 U.S. at 71. But upon reviewing the series of events that transpired in the case at bar, we find that Defendants' actions cannot be deemed "objectively reasonable." Instead, it seems that the officers executed a seizure "in the absence of objectively reasonable grounds for doing so." *Id*. at 72.

Zinious, the Augusta House director, called the police to the scene complaining of problems with Plaintiffs. She told the officers that the Augusta House was a transitional shelter and that Plaintiffs were residents at the shelter who did not pay rent. She also claimed that Plaintiffs had violated the Augusta House rules by possessing contraband and physically threatening other residents. Zinious further represented that she had asked Plaintiffs to leave for the previous two weeks but that they had refused to do so and that an eviction under these circumstances was "standard procedure." Defendants claim that it was reasonable for them to rely on Zinious' representations and carry out the eviction. But this assertion is implausible. The officers did not undertake any effort to determine whether Plaintiffs were indeed residents who paid rent and had a right to be on the premises. They never asked

Plaintiffs' rights to procedural due process have been violated. *See Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1307 (4th Cir 1992) (holding that, "absent exigent circumstances, no-notice evictions violate due process"). However, Defendants dispute this result for several reasons, each of which we find meritless.

Defendants contend that *Good Real Prop.* and *Flatford* are inapplicable to the instant case because in those cases, the government was attempting to assert its own interest in property via civil forfeiture and condemnation proceedings, while in the instant case the shelter manager was asserting the shelter's right to control its property. Yet, they cite no reason why this Court should analyze the instant context any differently. Defendants also argue that, as government actors, they were neither bound by Kentucky's prohibition on self-help evictions, nor were they authorized under that statute to resolve the dispute through predeprivation judicial process. However, this does not mean that the officers could have done through means of government authority what Laura Zinious could not have done absent a judicial eviction order. Officers should at least be expected to refrain from actively participating in breaking the law. *See Abbot v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998) (holding that a plaintiff had a valid procedural due process claim under similar circumstances).

### 2. Contemporaneous constitutional claims are permissible

Defendants also claim that Plaintiffs' claims should not be considered under the Fourteenth Amendment Due Process Clause, and that our attention should be focused on what Defendants term the more specific Fourth Amendment standards. Defendants argue that they merely exercised a type of discretion akin to a determination of probable cause and not a decision to interfere with Plaintiffs' possessory interests in property. They note that had Plaintiffs been arrested for trespass, the issue for consideration would be whether there was probable cause to effectuate such an arrest. Therefore,

satisfy the dictates of due process."); *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) ("The right to prior notice and a hearing is central to the Constitution's command of due process.").

The Supreme Court has recognized, however, that "extraordinary situations," where a valid governmental interest exists, may justify postponement of such a hearing until after eviction. *Fuentes*, 407 U.S. at 80-81. "A prior hearing is not constitutionally required where there is a special need for very prompt action to secure an important public interest and where a governmental official is responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in a particular instance." *Flatford*, 17 F.3d at 167 (citing *Fuentes*, 407 U.S. at 91). In *Flatford*, we rejected a due process claim alleging a lack of predeprivation process in connection with the emergency evacuation of tenants. We held that, although an emergency eviction from one's home is a significant intrusion, "where the need to protect lives is the basis for such an intrusion, government officials should not be made to hesitate in performing their duties, particularly where postdeprivation remedies can immediately correct any errors in judgment." *Flatford*, 17 F.3d at 168. However, we emphasized that tenants are generally "entitled to pre-eviction judicial oversight in the absence of emergency circumstances." *Id.* at 170.

In the case at bar, Defendants have neither claimed, nor have they pointed to any evidence that would tend to prove, that exigent circumstances existed to justify Plaintiffs' eviction. Yet, the officers "unceremoniously dispossessed" Plaintiffs of their place of residence without affording them an opportunity to be heard at any type of predeprivation hearing. *Soldal*, 506 U.S. at 62. "It is extraordinary here that the plaintiffs were put to such an indignity utterly without cause or reason, and [D]efendants have not even attempted to suggest a governmental or private interest amounting to 'exigent circumstances.'" *Sallie v. Tax Sale Investors, Inc.*, 998 F. Supp. 612, 619-20 (D. Md. 1998). Thus, it seems that

Zinious if she had any legal authority to evict Plaintiffs and they knew that she did not have a court order. Despite efforts by at least one Plaintiff to provide documentation supporting their legal right to reside at the Augusta House, the officers ignored Plaintiffs' pleas and escorted them from the premises.

The Supreme Court recognized in *Soldal* that a showing of unreasonableness where officers act pursuant to a judicial order "would be a laborious task indeed." 506 U.S. at 71. In addition, we have previously held that a police officer's mere presence as a "civil standby" to observe and maintain the peace at a lawful statutory repossession entitles a defendant to qualified immunity. *Haverstick Enterprises, Inc. v. Financial Credit, Inc.*, 32 F.3d 989 (6th Cir. 1994); *see also Apostol v. Landau*, 957 F.2d 339 (7th Cir. 1992); *but cf. Quinones v. Tentler*, No. 00-C-5294, 2001 WL 681274 (N.D. Ill. 2001) (holding that police officers who threatened a tenant with arrest at the request of an evicting landlord had perpetrated a "seizure" of property in violation of the Fourth Amendment). However, in the instant case, Defendants' involvement was neither brief nor passive; rather, they actively participated in the illegal seizure. The officers acted without a warrant or other court order legitimating their conduct and blindly carried out Zinious' wishes by forcing Plaintiffs to leave their place of residence. *See Open Inns, Ltd. v. Chester County Sheriff's Dep't*, 24 F. Supp. 2d 410 (E.D. Pa. 1998). In addition, Defendants admit that the local sheriff's department, not Louisville police officers, are charged with the task of enforcing judicial eviction orders. Furthermore, Defendants do not claim that exigent circumstances existed that would have justified the eviction. At any rate, despite Zinious' allegations of physical threats, there is no evidence that Plaintiffs posed an immediate harm to themselves or to others such as would warrant their removal from the premises. *Cf. Flatford*, 17 F.3d at 170-71 (holding that police officers who assisted in evicting tenants were entitled to qualified immunity because they reasonably presumed the validity of a building inspector's determination that exigent circumstances existed which posed a danger to tenants).

From the standpoint of "objective legal reasonableness," then, Defendants are not entitled to the protection of qualified immunity providing them with immunity from this lawsuit. *See Anderson*, 483 U.S. at 639 (quoting *Harlow*, 457 U.S. at 819). Here, Defendants were informed that Plaintiffs were legal residents of the house, having keys to the premises and paying rent for their individual rooms. Further, Defendants were provided with documentation establishing that Plaintiffs were tenants under Kentucky law. Defendants also knew or should have known that a court order is needed to perform an eviction. Further, Defendants were aware that the Sheriff's Department, not the police, carried out court-ordered evictions in Louisville. Moreover, there were no emergency or exigent circumstances. Based upon the foregoing facts, Defendants could not have had a reasonable belief that they could legally evict Plaintiffs from the Augusta House.

Finally, a balancing of the governmental and private interests at stake makes the unreasonableness of the seizure plain. I agree with the district court that, absent a court order or exigency, the government's interest in evicting Plaintiffs from their home was "minimal at best," especially in comparison to Plaintiffs' private interest in retaining possessory rights to their place of residence. The officers therefore subjected Plaintiffs to an unreasonable seizure in deprivation of their Fourth Amendment rights.

## C. Deprivation of Fourteenth Amendment Rights

Defendants also dispute the district court's holding that the non-judicial eviction constituted a denial of Plaintiffs' rights to procedural due process under the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment guarantees that "[n]o State shall deprive . . . any person of life, liberty, or property, without due process of law." U.S. CONST. amend XIV. Procedural due process claims are examined under a two-part analysis. First, the court must determine whether the interest at stake is a protected liberty or property right under the Fourteenth Amendment. Only after identifying such a right do we continue to consider

whether the deprivation of that interest contravened notions of due process. *See Bd. of Regents v. Roth*, 408 U.S. 564, 570-71 (1972); *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989); *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *Ferencz v. Hairston*, 119 F.3d 1244, 1247 (6th Cir. 1997); *Tony L. v. Childers*, 71 F.3d 1182 (6th Cir. 1995). Property interests are not created by the Constitution. *Cleveland v. Bd. of Educ. of Loudermill*, 470 U.S. 532, 538 (1985). Instead, they are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Roth*, 408 U.S. at 577; *see also Verba v. Ohio Cas. Ins. Co.*, 851 F.2d 811, 813 (6th Cir. 1988). Under Kentucky law, tenants holding leasehold estates have a recognized property interest. *See* K.R.S. § 383.590. Thus, Plaintiffs have a recognized property interest for Fourteenth Amendment purposes.

### 1. Due process demands predeprivation process

It is well-established that possessory interests in property invoke procedural due process protections. *See Fuentes v. Shevin*, 407 U.S. 67, 87 (1972). Due process generally requires notice and a hearing prior to eviction.[10] *Id.* at 82; *Leary v. Daeschner*, 228 F.3d 729, 742 (6th Cir. 2001) ("When a plaintiff has a protected property interest, a predeprivation hearing of some sort is generally required to

---

[10]As the Fourth Circuit stated, due process in the eviction context requires the following:

(1) timely and adequate notice detailing reasons for proposed termination, (2) an opportunity on part of tenant to confront and cross-examine adverse witnesses, (3) right of tenant to be represented by counsel provided by him to delineate issues, present factual contentions in an orderly manner, conduct cross-examination and generally to safeguard his interest, (4) a decision, based on evidence adduced at hearing, in which reasons for decision and evidence relied on are set forth, and (5) an impartial decision maker.

*Caulder v. Durham Hous. Auth.*, 433 F.2d 998, 1004 (4th Cir. 1970) (citing *Goldberg v. Kelly*, 397 U.S. 254 (1970)).